**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, SONY MUSIC ENTERTAINMENT, ALAMO RECORDS, LLC, ARISTA MUSIC, ARISTA RECORDS, LLC, LAFACE RECORDS, LLC, RECORDS LABEL, LLC, SONY MUSIC ENTERTAINMENT US LATIN, LLC, ULTRA RECORDS, LLC, VOLCANO ENTERTAINMENT III, LLC, and ZOMBA RECORDING LLC,

Plaintiffs,

v.

SUNO, INC., and JOHN DOES 1-10,

Defendants.

Case No.:

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs UMG Recordings, Inc. ("UMG") and Capitol Records, LLC ("Capitol," and collectively with UMG, "Universal"); Sony Music Entertainment ("SME"), Alamo Records, LLC ("Alamo"), Arista Music, Arista Records, LLC ("Arista Records"), LaFace Records, LLC ("LaFace"), Records Label, LLC ("Records Label"), Sony Music Entertainment US Latin, LLC ("SME US Latin"), Ultra Records, LLC ("Ultra"), Volcano Entertainment III, LLC ("Volcano"), and Zomba Recording LLC ("Zomba" and collectively with SME, Alamo, Arista Music, Arista Records, LaFace, Records Label, SME US Latin, Ultra, and Volcano, "Sony" and together with Universal, "Plaintiffs"), by and through their undersigned counsel, file this Complaint against Suno, Inc. ("Suno") and allege as follows:

## NATURE OF THE ACTION

1. This is the second action brought by two record companies and their affiliates to vindicate their rights in the enormous number of copyrighted sound recordings that Suno copied

without permission to train the commercial artificial intelligence ("AI") models that power its generative AI service. Because Suno concealed the contents of its training data, the complaint in the previous action identified a minuscule, illustrative fraction of the recordings Suno had actually copied. Though the 60,202 sound recordings asserted in this action may more closely reflect the breadth of Suno's infringement, in reality they remain only a small portion of Plaintiffs' works that Suno infringed.

2. Like the prior lawsuit, this case concerns Suno's generative AI service, which allows users to generate digital music files that sound like genuine human sound recordings in response to basic inputs. The capacity for a generative AI service, like Suno's, to produce convincing imitations of genuine sound recordings starts with copying a vast range of sound recordings. In Suno's case, this involved copying an enormous volume of copyrighted sound recordings, including those owned or controlled by Plaintiffs, and ingesting them into its AI models. Suno did so without seeking or obtaining permission from the rightsholders who own those recordings, including Plaintiffs. It obtained many of these recordings in the first instance by unlawfully "stream ripping" them from YouTube in circumvention of the technological measures designed to prevent exactly such unauthorized access.

3. Foundational principles of copyright law dictate that copying protected sound recordings for the purpose of developing a commercial AI product requires permission from rightsholders. Otherwise, such AI offerings will erode the value of the artistic works that comprise the essential raw materials that allow them to function in the first place. Supplanting human creativity is Suno's stated ambition. Suno's co-founder and Chief Executive Officer, Michael ("Mikey") Shulman, has explained that "[w]e didn't just want to build a company that makes the current crop of creators 10 percent faster or makes it 10 percent easier to make music. If you want to impact the way a billion people experience music you have to build something for a billion people."[1] Suno was never conceived as a service to serve the artists whose recordings it copied.

[1] 20VC Podcast with Harry Stebbings, *Mikey Shulman, CEO @Suno: The Future of Music, What is Gonna Happen?* at 23:01-23:16 (Jan. 10, 2025).

Rather, Mr. Shulman and Suno's other co-founders conceived the service to reach those artists' listeners with machine-generated substitutes for their works. If left unmoored from existing and longstanding legal constraints, AI services like Suno's, and the mass of substitutive outputs they generate, could supplant, rather than support, genuine human creativity.

4. As observed in the intervening time since Plaintiffs initiated the original lawsuit against Suno, the service's synthetic outputs are already saturating the market with machine-generated content that directly competes with, cheapens, and ultimately drowns out the genuine sound recordings on which the service is built. The flood is unprecedented. Indeed, Deezer, a major streaming service, reported in July 2026 that AI-generated tracks had for the first time exceeded half of all daily new music deliveries to its platform, amounting to roughly 90,000 machine-made tracks uploaded every day.[2] Suno itself has touted to investors that its users generate a Spotify catalog's worth of outputs every two weeks.[3]

5. In June 2024, Plaintiffs, alongside a group of other record companies, first sued Suno for its unauthorized use of their sound recordings to train its commercial AI models. *See UMG Recordings, Inc. v. Suno, Inc.*, No. 1:24-cv-11611 (FDS) (D. Mass.) (filed June 24, 2024) (the "Original Action"). In responding to the allegations in the Original Action, Suno admitted the essential facts underpinning the allegations in this case. Specifically, Suno acknowledged that it "constructed" its models "by showing the program tens of millions of instances of different kinds of recordings" and admitted that those recordings "presumably included recordings whose rights are owned by the Plaintiffs in this case." Suno nonetheless refused to identify the specific recordings on which it trained, which forced Plaintiffs to engage in a forensic analysis of Suno's training data corpus. That analysis identified ***millions*** of Plaintiffs' copyrighted works within Suno's training dataset, each of which Suno copied without authorization to train a service designed to imitate and compete with the recordings Suno took.

---

[2] Jesper Wendel, *Deezer: AI Music Has Surpassed 50% of New Music Uploads for the First Time*, Deezer (July 21, 2026).

[3] Kristin Robinson, *Suno Creates an Entire Spotify Catalog's Worth of Music Every Two Weeks, Says Investor Pitch Deck for $250M Fundraise*, Billboard (Nov. 24, 2025).

6. Plaintiffs previously moved for leave to amend the complaint in the Original Action to assert claims as to more than 61,000 additional infringed works identified through their forensic analysis of Suno's training data. Suno opposed that motion. On August 18, 2026, the Court denied that motion without prejudice, on the primary basis that the amendment would impact the existing case schedule. The Court made clear that "Plaintiffs are of course entitled to pursue valid claims for copyright infringement, and the magnitude of the alleged infringement is not a defense." Among the available options, the Court concluded that proceeding in parallel cases best balances Plaintiffs' interests in enforcing their rights with judicial economy. As the Court contemplated, Plaintiffs accordingly bring this action to vindicate their rights in the many additional works Suno infringed that are not asserted in the Original Action.

7. Suno cannot avoid liability for its willful copyright infringement by claiming fair use. The doctrine of fair use promotes human expression by permitting the unlicensed use of copyrighted works in certain, limited circumstances, but Suno offers imitative machine-generated music—not human creativity or expression. Moreover, the Copyright Act enumerates four factors to assess whether an unauthorized use is fair, none of which favors Suno. These factors are: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. Suno's use of Plaintiffs' copyrighted sound recordings is quintessentially commercial and non-transformative, because the service it developed using Plaintiffs' recordings is designed to output directly competitive digital music files that serve the same purpose as, and substitute for, Plaintiffs' genuine, human-created recordings. A product built by copying expressive works to produce audio files designed to occupy the same place in listeners' lives and in the marketplace as genuine human recordings is the antithesis of fair use.

8. Mr. Shulman's own about-face illustrates the point. After Plaintiffs initiated the Original Action, Mr. Shulman defended Suno's industrial-scale copying by pointing to its policy of preventing users from prompting its service with artist names as proof that its models were

"designed to generate completely new outputs."[4] This design feature turned out to be so fundamental that Suno simply switched it off and now permits users to freely prompt its service using names of specific recording artists through prompt augmentation. Irrespective of Suno's contention that it is capable of generating "new" outputs, it is indisputable that Suno is actively commercializing these outputs, which is only possible because of Suno's unauthorized use of Plaintiffs' sound recordings to train its models. The remaining factors similarly cut against Suno: it copied the key expressive features of Plaintiffs' copyrighted sound recordings; those copyrighted sound recordings are at the core of copyright protection; and Suno's infringement undermines both existing and potential commercial markets for selling, licensing, and distributing sound recordings. If left unchecked, Suno risks upending whole segments of the legitimate music industry.

9. Suno has profited substantially from its infringement of Plaintiffs' copyrighted sound recordings. Suno's latest funding round raised more than $400 million, valuing the company at approximately $5.4 billion, a dramatic increase from its previous funding round in the fall of 2025 when Suno raised funds at a $2.45 billion valuation. Suno's business is generating hundreds of millions of dollars annually, and Suno projects its revenue will reach $1 billion by 2028.[5] Suno further touts a roster of high-profile backers and has monetized its service, charging users up to $24 per month for its highest subscription tier. Those backers understood what they were funding, as one of Suno's earliest investors candidly admitted that "if we had deals with labels when this company got started, I probably wouldn't have invested in it," because Suno "needed to make this product without the constraints."[6] What Suno's investor deemed an unacceptable "constraint" is the permission that copyright law requires and that any legitimate music business must obtain to commercially exploit copyrighted sound recordings. None of

---

[4] Kristin Robinson, *AI Firms Udio and Suno React to Major Labels' Lawsuit: 'We Stand Behind Our Technology'*, Billboard (June 25, 2024).

[5] Murray Stassen, *Suno: We've Hit 2M Paid Subscribers and $300M Annual Revenue*, Music Business Worldwide (Feb. 26, 2026); *see also* Kristin Robinson, *Is Suno the Music Industry's Biggest Nightmare – Or Greatest Hope?*, Billboard (Mar. 11, 2026).

[6] Brian Hiatt, *A ChatGPT for Music is Here. Inside Suno, the Startup Changing Everything*, Rolling Stone (Mar. 17, 2024).

Suno's funding, and none of the revenue generated as a result, would exist without the vast troves of copyrighted sound recordings that Suno copied to train its AI models.

10. Tellingly, even as it litigates the Original Action, Suno reversed course in the marketplace. In November 2025, Suno entered into a licensing agreement with former plaintiff Warner Music Group to use sound recordings as training data for generative AI models and announced plans to "deprecate" its "current models."[7] Mr. Shulman personally attested to the commercial prospects of that deal, explaining "I don't think of what we did as a settlement. I think about this much more like a partnership . . . . It is much more long term."[8] Within the last month, Suno announced a second such agreement, which it described as a "landmark global partnership" with BMG, "one of the largest music companies" and one that had never sued Suno.[9] Mr. Shulman touted the partnership as one that will "generate new revenue" for artists and songwriters, acknowledging that building tools "responsibly means working directly with the people who make music and the companies that represent them."[10] And on September 8, 2026, Suno announced a third "strategic partnership" with Believe, a leading digital music company, to supply training data for Suno's models.[11] Three agreements with three major rightsholders in less than a year confirm that a functioning market exists for licensing sound recordings to train generative AI models and that Suno itself recognizes that using copyrighted sound recordings for this purpose requires permission. Suno's belated embrace of licensing only underscores the unlawfulness of its decision to copy Plaintiffs' recordings, without a license or payment, in the first place.

11. Suno's infringement continues through the present, including in the development of the newest iteration of its models, released on September 9, 2026, which Suno has coined "v6."

---

[7] Press Release, Warner Music Group, *Warner Music Group and Suno Forge Groundbreaking Partnership* (Nov. 25, 2025).

[8] Robinson, *supra* note 5.

[9] Mikey Shulman, *Announcing a Landmark Global Partnership with BMG*, Suno (Aug. 12, 2026).

[10] Press Release, BMG, *BMG and Suno Announce Global Strategic Alliance Advancing AI Music Opportunities And Revenue Streams* (Aug. 12, 2026).

[11] Press Release, *Believe and Suno Announce Strategic Partnership to Advance Licensed AI Music Opportunities for Independent Artists and Labels*, Believe (Sept. 8, 2026).

On information and belief, Suno developed v6 using Plaintiffs' copyrighted sound recordings, unauthorized copies of which Suno retains to this day. Suno has also publicly acknowledged that it trained v6 on its users' "interactions" with Suno's service—that is, on the outputs of, and preference signals derived from, prior models that Suno built by copying Plaintiffs' recordings without authorization. Whatever the sources of v6's training corpus, Suno built v6 by continuing to reproduce and exploit Plaintiffs' copyrighted works without authorization or payment.

12. At its core, this case is about ensuring that copyright continues to incentivize human invention and imagination, as it has for centuries. Achieving this end does not require stunting technological innovation, but it does require that Suno adhere to copyright law and respect the creators whose works allow it to function in the first place.

13. Plaintiffs thus bring this action seeking injunctive relief and damages commensurate with the scope of Suno's massive infringement of their copyrighted sound recordings.

## THE PARTIES

14. Plaintiffs comprise the world's foremost record companies and recorded music businesses, engaged in the business of producing, manufacturing, distributing, selling, licensing, and otherwise commercializing sound recordings in the United States and the world through various media. Plaintiffs have made substantial investments in the development and promotion of some of the most prolific and well-known recording artists in the world. Plaintiffs' investments extend further to lesser-known artists as well, with an eye toward sustaining the music industry and discovering and supporting new generations of recording artists across all genres and styles. Pursuant to their relationships with artists, Plaintiffs own or exercise exclusive control over rights in millions of sound recordings of enormous cultural significance, artistic merit, and economic value.

15. Plaintiff UMG Recordings, Inc. is a Delaware corporation with its principal place of business at 2220 Colorado Avenue, Santa Monica, California 90404. UMG owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

16. Plaintiff Capitol Records, LLC is a Delaware limited liability company with its principal place of business at 2220 Colorado Avenue, Santa Monica, California 90404. Capitol owns or exercises exclusive control over the copyrights for the sound recordings within its catalog. A non-exhaustive list of specific sound recordings owned or exclusively controlled by Universal that Suno has infringed is attached as Exhibit A (the "Universal Works").

17. Plaintiff Sony Music Entertainment is a Delaware general partnership, the partners of which are citizens of New York and Delaware. Sony's headquarters and principal place of business are located at 25 Madison Avenue, New York, New York 10010. Sony owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

18. Plaintiff Alamo Records, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. Alamo is a subsidiary of SME. Alamo owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

19. Plaintiff Arista Music is a New York partnership with its principal place of business at 25 Madison Avenue, New York, New York 10010. Arista Music is a subsidiary of SME. Arista Music owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

20. Plaintiff Arista Records, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. Arista Records is a subsidiary of SME. Arista Records owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

21. Plaintiff LaFace Records, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. LaFace is a subsidiary of SME. LaFace owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

22. Plaintiff Records Label, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. Records Label

is a subsidiary of SME. Records Label owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

23. Plaintiff Sony Music Entertainment US Latin, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. SME US Latin is a subsidiary of SME. SME US Latin owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

24. Plaintiff Ultra Records, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. Ultra is a subsidiary of SME. Ultra owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

25. Plaintiff Volcano Entertainment III, LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. Volcano is a subsidiary of SME. Volcano owns or exercises exclusive control over the copyrights for the sound recordings within its catalog.

26. Plaintiff Zomba Recording LLC is a Delaware limited liability company with its principal place of business at 25 Madison Avenue, New York, New York 10010. Zomba is a subsidiary of SME. Zomba owns or exercises exclusive control over the copyrights for the sound recordings within its catalog. A non-exhaustive list of specific sound recordings owned or exclusively controlled by Sony that Suno has infringed is attached as Exhibit A (the "Sony Works").

27. A non-exhaustive, illustrative sampling of Plaintiffs' federally copyrighted sound recordings that Suno has illegally reproduced is attached hereto as Exhibit A. Plaintiffs currently commercially exploit, and at all relevant times have commercially exploited, all the sound recordings listed in Exhibit A. Plaintiffs expressly reserve the right to expand the list of works that Suno infringed at the appropriate time.

28. Defendant Suno, Inc. is a Delaware corporation with its principal place of business at 17 Dunster Street, Cambridge, Massachusetts 02138.

29. Defendants John Does 1-10 are unknown parties who directly copied Plaintiffs' federally copyrighted sound recordings, worked with Suno to copy Plaintiffs' federally copyrighted sound recordings, or have knowledge of Suno's direct infringement of the copyrighted sound recordings and intentionally induced and materially contributed to the infringement by assisting Suno's compiling, scraping, and/or copying of the copyrighted sound recordings for Suno's training data, intentionally promoted or encouraged Suno's infringing conduct or otherwise facilitated it, and/or supervised and financially benefited from Suno's infringement.

## JURISDICTION AND VENUE

30. This is a civil action seeking damages and injunctive relief for infringement under the Copyright Act, 17 U.S.C. §§ 101, *et seq*., and the Music Modernization Act, 17 U.S.C. § 1401. As such, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), based on federal question jurisdiction.

31. This Court has personal jurisdiction over Defendant Suno because its principal place of business, listed as 17 Dunster Street, Cambridge, Massachusetts 02138, is in this district.

32. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Suno resides in this district.

## FACTUAL BACKGROUND

### Sound Recordings at Issue

33. Plaintiffs own or exercise exclusive control over copyrights and/or exclusive rights under federal law in and to numerous valuable sound recordings. Exhibit A, attached hereto and incorporated herein by reference, contains a non-exhaustive, representative list of copyrighted sound recordings owned or exclusively controlled by Plaintiffs that Suno has directly infringed (the "Copyrighted Recordings"). Plaintiffs or their predecessors in interest have obtained Certificates of Copyright Registration for each of the post-1972 Copyrighted Recordings identified in Exhibit A.

34. Plaintiffs own or exercise exclusive control over copyrights and/or exclusive rights in and to numerous valuable sound recordings first "fixed" before February 15, 1972, which are

protected under the Music Modernization Act ("MMA"), 17 U.S.C. § 1401 *et seq*. In enacting the MMA, Congress directed the U.S. Copyright Office to create a process for rightsholders to submit schedules of pre-1972 sound recordings so that the Copyright Office can publicly index the recordings. 17 U.S.C. § 1401(f)(5)(A)(ii). Once the Copyright Office indexes a work, a rightsholder who sues for infringement of that work can recover statutory damages and attorneys' fees just like any other copyright owner, pursuant to 17 U.S.C. §§ 504 and 505. For each of the pre-1972 Copyrighted Recordings listed in Exhibit A, Plaintiffs have filed with the Copyright Office schedules containing all information specified in 17 U.S.C. § 1401.

**Suno Launches in 2023**

35. In July 2023, a group of individuals who collaborated at Kensho Technologies, an AI solutions business, launched a "beta" version of Suno's AI music generation service. Suno's stated vision is to "build[ ] a future where anyone can make great music. Whether you're a shower singer or a charting artist, [Suno] break[s] barriers between you and the song you dream of making."[12]

36. Suno's co-founder and Chief Executive Officer, Mr. Shulman, has publicly explained the motivation underlying Suno's service. Because "[i]t's not really enjoyable to make music now,"[13] Suno built its service to sell a shortcut that circumvents the human creative process. To do so, Suno harvested the recordings of artists who had done the creative work its Chief Executive disparaged.

37. Suno initially engaged users to generate AI music files through its channel on the social media website Discord, and later rolled out a web interface to expand the reach of its music generation product. In December 2023, Suno announced a strategic partnership with Microsoft by which Suno's service would be integrated into Microsoft's AI chatbot Copilot.[14]

---

[12] Suno, About, https://suno.com/about.

[13] 20VC Podcast, *supra note 1*, at 23:26-23:29.

[14] Microsoft, *Turn Your Ideas into Songs with Suno on Microsoft Copilot* (Dec. 19, 2023), https://www.microsoft.com/en-us/microsoft-copilot/blog/2023/12/19/turn-your-ideas-into-songs-with-suno-on-microsoft-copilot/.

38. Whether using Suno's website interface or Microsoft's Copilot, Suno's product allows users to enter text prompts to generate digital music files. Users can prompt Suno's service with a description of the music they want to generate, which can include specifying the genre, lyrics, story direction, and themes to serve as inspiration. Within seconds, Suno's service processes the user's prompt and generates a digital music file (Suno's website generates two files per prompt, whereas Copilot's Suno plug-in generates one). Suno's customization options then allow users to adjust elements of the files, including tempo, mood, and genre.

39. Suno offers both free and paid versions of its product. Under the free plan, users are given 50 credits per day, equivalent to 10 music files. According to Suno's terms of service, free users cannot use the files they generate for commercial purposes.[15] Users can subscribe to the Pro and Premier plans for monthly fees of $8 and $24, respectively. The Pro plan gives users 2,500 credits per month, enough for 500 music files, while the Premier plan comes with 10,000 credits per month, enough for 2,000 music files. Under either paid subscription, Suno allows users to utilize their digital music files for commercial purposes, such as by uploading them to YouTube or music streaming services like Spotify or Apple Music. With this model, Suno earns revenue by encouraging users to generate digital music files and exploit them commercially. Put simply, the more digital music files Suno's service produces for its users, the more Suno charges.

40. On March 21, 2024, Suno launched a new version of its service, dubbed "v3," which it describes as its "first model capable of producing radio-quality music."[16] v3 enabled all users, free or paid, to generate digital music files up to two minutes in length virtually instantaneously.

41. On May 30, 2024, Suno launched yet another version of its service, named "v3.5," which it described as an updated version of v3.[17] v3.5 enabled all users, free or paid, to generate digital music files up to four minutes in length virtually instantaneously. Even before the release

---

[15] Suno, *Terms of Service* (Jan. 27, 2024), https://suno.com/terms.

[16] Suno Blog, *Introducing v3* (Mar. 21, 2024), https://suno.com/blog/v3.

[17] @suno_ai_, X (May 24, 2024), https://x.com/suno_ai_/status/1794145852723777559.

of v3.5, Suno announced that its next version, "v4," was already in development and promised to continue "improving along the axes of quality, control, and speed."[18]

42. On November 19, 2024, Suno released v4.[19] As promised, this version provided "cleaner audio, sharper lyrics, and more dynamic song structures."[20] v4 also introduced "Covers," which allows users to upload audio files that Suno then uses to "craft a brand-new interpretation that pays homage to the original."[21]

43. On May 1, 2025, Suno released "v4.5" to its paid subscribers, describing it as its "newest and most expressive model."[22] v4.5 expanded the service's genre range, enhanced its imitation of human vocals, and doubled the maximum length of generated music files to eight minutes. *Id.* v4.5 also upgraded the "Covers" feature so that outputs derived from uploaded recordings would "keep more melodic details" from the original. *Id.*

44. In July 2025, Suno released "v4.5+," which added features that generate new audio directly from existing recordings: "Add Vocals," which layers AI-generated vocals over uploaded instrumentals; "Add Instrumentals," which builds AI-generated instrumentals around uploaded voice recordings; and "Inspire," which generates music mimicking the vibe of existing songs featured in Suno playlists.[23] Announcing the release, Mr. Shulman boasted that "[t]his isn't a minor upgrade; it's a glimpse of the future: more people making more music, with better tools, in more intuitive ways," and that Suno was "introducing new workflows that change how music gets made."[24]

45. On September 23, 2025, Suno released "v5," which it marketed as its "most

---

[18] @suno_ai_, X (Mar. 21, 2024), https://x.com/suno_ai_/status/1770857568274911449.

[19] Suno Blog, *Introducing v4* (Nov. 19, 2024), https://suno.com/blog/v4.

[20] *Id*.

[21] *Id*.

[22] Team Suno, Introducing v4.5, Suno (May 1, 2025).

[23] Murray Stassen, *Suno is Getting More Advanced, as AI Music Generator Launches v4.5+ Update with 'Previously Unimaginable' Production Capabilities*, Music Business Worldwide (July 18, 2025).

[24] *Id.*

advanced music model yet" that "composes like a musician" and offers "studio-grade" audio with "natural and authentic vocals."[25] Alongside v5, Suno launched "Suno Studio," which Suno described as the first "generative audio workstation," allowing users to decompose music into individual stems (*i.e.*, vocals, drums, bass, and other instruments), edit them in a multitrack timeline, and generate new audio around them.[26] v5 also introduced "Sample to Song," which expands short uploaded audio clips into full compositions. On October 21, 2025, Suno extended this generation of its technology to free users through a model it coined "v4.5-all," because it "believe[s] that everyone should have access to tools that unlock their music potential."[27]

46. On March 26, 2026, Suno released "v5.5," which it called its "best and most expressive model yet."[28] v5.5 introduced "Voices," which allows users to record or upload vocal audio to incorporate into outputs; "My Taste," which learns each user's preferences over time; and "Custom Models," which invites users to upload at least six recordings that Suno uses to train "a personalized version of the model that knows your sound—so the music it makes sounds more like you."[29] Suno's new features prove the premise that underlies this entire action: training an AI model on a body of sound recordings causes the model to internalize, and reproduce, the distinctive style of those recordings. Suno announced that v5.5's capabilities "lay the foundation for the next generation of music models" it planned to launch "with the music industry later this year."[30]

47. On September 9, 2026, Suno launched "v6," a suite of three models—v6, v6 Wild, and v6 Mini. These models are equally the product of Suno's mass-scale infringement. On information and belief, Suno developed v6 using Plaintiffs' copyrighted recordings, unauthorized copies of which Suno retains to this day. Additionally, Suno has admitted that it trained v6 using

---

[25] Daniel Tencer, *Suno Releases 'Most Powerful' Model Yet, Days After Record Labels Allege Illegal 'Stream Ripping' From YouTube*, Music Business Worldwide (Sept. 24, 2025).

[26] Team Suno, Introducing Suno Studio (Sept. 25, 2025).

[27] Suno, v4.5-all: A New Free Model for Everyone (Oct. 21, 2025).

[28] Mikey Shulman, Co-Founder & CEO, Suno v5.5: More Expressive. More You., Suno (Mar. 26, 2026).

[29] *Id.*

[30] *Id.*

"user interactions" with previous iterations of its models. But these "interactions" are the outputs of, and preference data derived from, Suno's prior models, each of which was trained on the unlicensed corpus of copyrighted sound recordings described above, including Plaintiffs' Copyrighted Recordings. By Suno's own description of its model development practices, Suno mined data reflecting users' evaluations of the outputs of Suno's infringing models. According to Mr. Shulman, when users prompt Suno's models, Suno "give[s] users two songs and they will implicitly tell [Suno] one of those is better than the other."[31] Suno then "take[s] that signal and learn[s] from it what makes a song particularly catchy, particularly good," using "that information about these differences between songs to steer our models toward making music better."[32] To date, every such signal has been a judgment about audio outputs generated using Suno's unlicensed models—that is, synthetic outputs embodying the expressive features that Suno's tainted models derived from Plaintiffs' recordings. These "signals" that represent user preferences among paired outputs cannot be divorced from the outputs themselves. Nor are these synthetic outputs limited to audio generated entirely by Suno's models from text prompts, as Suno's service permits users to upload existing audio that Suno's models then alters. On information and belief, Suno accordingly trained v6 on synthetic audio files that users generated or altered with its prior tainted models, with preference data that is keyed to those outputs, or both. Either way, Suno trained v6 with material that exists only because Suno copied Plaintiffs' recordings without authorization. On information and belief, certain of those synthetic outputs embody expression that Suno copied from Plaintiffs' Copyrighted Recordings and, to the extent they do, Suno's reproduction of those outputs to assemble v6's training corpus was a further unauthorized exploitation of Plaintiffs' works.

48. On information and belief, Suno also developed v6 using knowledge distillation and related model-transfer techniques, whereby a new "student" model is trained to reproduce the

---

[31] Kristin Robinson, *Suno Launches First AI Music Models "In Partnership With the Music Industry,"* Billboard Pro (Sept. 9, 2026).

[32] *Id.*

learned behavior of a predecessor "teacher" model, including through training of the "student" on both non-synthetic data and synthetic outputs of the "teacher." Such techniques allow the capabilities of a predecessor model to be transferred to a successor model, and can involve processes that prevent the successor model from forgetting the knowledge transferred to it from the predecessor model while continuing to train such successor model on new data. Here, the "teachers" are Suno's prior models, and the capabilities they transmit—how to compose, arrange, and render convincing imitations of human-created music across genres and styles—were derived from the unlicensed recordings on which those models trained, including Plaintiffs' Copyrighted Recordings, copies of which Suno retains. On information and belief, Suno's development of v6 drew on these retained copies of Plaintiffs' Copyrighted Recordings and/or other retained materials arising from, relating to and/or constituting those prior models, including by passing data through, benchmarking against, and extracting the learned behavior of the prior models. A successor model that inherits those capabilities also inherits the value of Plaintiffs' Copyrighted Recordings. v6's training corpus, in substance, embodies the accumulated learnings of models built on Plaintiffs' works. Accordingly, Suno's development and commercialization of v6 is an extension of Suno's continued, unauthorized exploitation of Plaintiffs' works.

49. Training a "new" model on the outputs of an infringing model does not eliminate the infringement; it launders it, passing the value of Plaintiffs' expression from the copied recordings into the tainted models, from those models into their outputs, and from those outputs into v6. Nor can Suno's users who generated the outputs in the first instance cure the defect. Whatever rights users purport to grant Suno in their generated outputs, no user can license expression that Suno's models derived from Plaintiffs' recordings. But Suno did not even complete this laundering, as Suno has never claimed to have destroyed or ceased using the unauthorized copies of copyrighted works it unlawfully obtained in the first instance, and on information and belief it retains and continues to use them. v6 is not a fresh start; it is the fruit of the same poisoned tree. Suno's development of v6 continued, rather than ended, its unauthorized exploitation of Plaintiffs' Copyrighted Recordings.

50. On information and belief, each of Suno's successive models—v4, v4.5, v4.5+, v5, v4.5-all, and v5.5—was trained on the same corpus of copied sound recordings described above. Each of those models is therefore infringing: each was built by reproducing Plaintiffs' Copyrighted Recordings without authorization, and Suno has deployed each to exploit those recordings commercially. Suno has never disclosed that any of these model versions was trained without Plaintiffs' recordings. And, as alleged above, v6 is no different: it is a product of those tainted models and of the unauthorized copies of Plaintiffs' recordings that Suno retains and continues to use. Thus, every model Suno has ever released—from its earliest versions through v6—is the product of, and continues to exploit, Suno's unauthorized copying of the Copyrighted Recordings.

**Suno Trains its AI Using Copyrighted Recordings**

51. AI models are developed to flexibly perform tasks that are typically expected to require human intelligence to achieve. "Generative AI" is a kind of AI aimed at producing content such as text, images, or (in Suno's case) audio. The generative AI models rapidly advancing today, including Suno's, are based on machine learning models. These models do not employ preset rules for generating outputs but rather deduce patterns from a large corpus of training content. They store these patterns as billions of numerical parameters. In aggregate, these parameters constitute the models. The training process adjusts the parameters so that the models produce content that is based on the content on which the models are trained.

52. Consistent with the basic facts of how generative AI works, the content Suno used to "train" its AI models includes millions of copyrighted sound recordings that Suno reproduced without permission from rightsholders, including Plaintiffs. Suno moreover obtained those copies by unlawfully "stream ripping" them from YouTube and circumventing technologies specifically designed to prevent such unauthorized copying. Suno could not have built models capable of producing audio so similar to the Copyrighted Recordings without the initial act of copying those recordings. Indeed, Suno admitted that in order for its AI tool to generate outputs "in long-established artistic genres," its models "must" in their training phase "have encountered and identified common patterns from prior examples." This approach to model training prompted one

of Suno's chief investors to publicly recognize that Suno's service was likely to spawn litigation and that defending lawsuits from music labels is "the risk we had to underwrite when we invested in the company."[33]

53. Similar to other generative AI audio models, Suno trains its AI models to produce audio output by generally taking the following steps:

a. Suno first copies massive numbers of sound recordings and associated metadata by unlawfully stream-ripping them from digital sources like YouTube despite technologies designed to prevent such piracy. A portion of this vast collection of information forms the input, or "corpus," upon which the Suno AI models are trained. Suno further stores the illicit copies of these sound recordings for additional purposes as it sees fit, including to train additional AI models and reference the underlying dataset.

b. Suno then "cleans" the copied recordings to remove any material, whether technical or substantive, that it does not wish to include in its AI models and puts the data into standard formats.

c. Suno then makes additional copies and encodes the scraped sound recordings, transforming them into formats that can be used by the AI models.

d. Suno then ingests this corpus of previously copied recordings into its AI models to train them to create outputs.

54. After undergoing this training process, Suno's service gains the capacity to generate audio output based on Suno's models, which, as just described, are products of the corpus of sound recordings on which they are trained. When a user prompts Suno's service with a text input (*e.g.*, make a jazz song about New York), the service generates an audio output by deducing what the audio output should sound like based on associations between the prompt and patterns deduced

---

[33] Hiatt, *supra* note 6.

from the corpus of sound recordings on which it was trained. Certain features of the outputs from Suno's models betray that they were trained on particular data—in this case, the Copyrighted Recordings. In particular, Suno's product frequently generates outputs with strong resemblance to the Copyrighted Recordings, a telltale sign that such recordings were included in its training data. Suno is clearly aware that its users are interested in generating outputs that bear resemblance to human expression, as evidenced by Suno's decision to permit users to prompt its service using artist names.

55. In technical terms, by generating outputs that mimic sound recordings in its training corpus, Suno's models reflect the machine-learning phenomenon known as "overfitting." An AI model is "overfitted" when it is too closely adapted to the data on which it was trained, making it difficult for the model to generalize to new data sets. One symptom of overfitting is a model that replicates portions of its training data. To take a simplified example, if a user inputs the prompt "a jazz song about New York" into an overfitted AI model, the model may output a file that closely resembles one of the jazz tracks on which it trained. Suno designed its product in this way, as it could not create a viable product if it was incapable of generating outputs that users find appealing. This infringement cannot be cured by simply loosening the models' fit or by implementing technical guardrails that make it less likely that outputs will match excerpts of the Copyrighted Recordings. In other words, modifying Suno's offering in a way that better conceals its training data would not alter the fact that Suno infringed the Copyrighted Recordings the moment it copied them to create its models. Irrespective of any overfitting issue, Suno's AI models have indelibly memorized the Copyrighted Recordings.

56. The basic point is that Suno's models require a vast corpus of sound recordings in order to output synthetic music files that are convincing imitations of human music. Suno's corpus includes the body of recorded music that people listen to in their everyday lives. Because of their sheer popularity and exposure, the Copyrighted Recordings had to be included within Suno's training data for Suno's models to be successful at creating the desired human-sounding outputs. Suno's models rely on the Copyrighted Recordings, which have a proven commercial track record,

in order to generate outputs that users will enjoy listening to, which in turn sustain Suno's business.

57. Prior to the filing of the Original Complaint, one of Suno's earliest investors all but admitted that Suno's service trains on Plaintiffs' sound recordings. Antonio Rodriguez, a partner at the venture capital firm Matrix Partners, explained that his firm invested in the company with full knowledge that Suno might get sued by copyright owners, which he understood as "the risk we had to underwrite when we invested in the company."[34] Rodriguez pulled the curtain back further when he added that "honestly, if we had deals with labels when this company got started, I probably wouldn't have invested in it. I think they needed to make this product without the constraints."[35] By "constraints," Rodriguez was, of course, referring to the need to adhere to ordinary copyright rules and seek permission from rightsholders to copy and use their works. Rodriguez's message was clear: he was willing to "underwrite" the costs of the lawsuits relating to Suno's large-scale intellectual property theft because he expected his investment in Suno to be accretive despite the damages owed to copyright owners.

58. Around its launch, Suno's unlawful copying of the Copyrighted Recordings into its training data was not lost on even casual users of Suno's product. Indeed, many observers drew this obvious conclusion, expressing alarm over the scope of Suno's unauthorized copying. To provide just a sample:

- "Though neither company will directly confirm or deny it, there is substantial reason to believe that . . . Suno . . . w[as] trained on copyrighted music, without permission[.]" Brian Hiatt, *AI-Music Arms Race: Meet Udio, the Other ChatGPT for Music*, Rolling Stone (Apr. 10, 2024).
- "While details about the data that trained these AI tools are sparse, there is plenty of reason to believe that they are trained on copyrighted music." Sharon Goldman, *AI Music May be Having a Moment, But Human Songwriters Would Like a Word*,

[34] *Id.*

[35] *Id.*

Fortune (May 17, 2024).

- "Although Suno hasn't revealed what music has been used to train its music-generation models, it seems almost certain that the startup has used materials without the explicit consent of their creators. For one thing, many of its musical outputs are somewhat similar to popular songs." Mike Wheatley, *Generative AI Music Maker Startup Suno Raises $125M in Funding*, SiliconAngle (May 21, 2024).
- "To create music as convincing as some of the examples generated by Suno and other platforms using AI algorithms means training those algorithms on existing music, and lots of it. And that's where copyright comes into play, because it's become plainly obvious that many AI models have been built by ingesting enormous quantities of copyrighted material." Daniel Tencer, *Suno Could Get Sued By The Record Business. Who's Backing it With $125M?*, Music Business Worldwide (May 28, 2024).

59. When directly accused of using Plaintiffs' sound recordings, Suno dodged and did not even try to dispute Plaintiffs' allegations. Beyond this effective concession, Suno obfuscated and claimed that its training data is "confidential business information."

60. Suno confirmed these facts in answering the complaint in the Original Action. Suno admitted that its generative AI models were "constructed by showing the program tens of millions of instances of different kinds of recordings" and that these models generate outputs that mimic existing styles using "statistical insights about the auditory characteristics of those recordings." Suno also admitted that "the tens of millions of recordings that Suno's model was trained on presumably included recordings whose rights are owned by the Plaintiffs in this case."

61. Suno did not (and could not) contend that Plaintiffs' recordings were absent from its training data. It asserted only that the precise contents of that data would be borne out in discovery. This discovery has since confirmed the presence of ***millions*** of Plaintiffs' recordings in Suno's corpus.

62. Moreover, on information and belief, Suno did not delete the sound recordings it copied to train its models once training was complete. Instead, Suno retained—and continues to retain—copies of those recordings, including Plaintiffs' Copyrighted Recordings, in one or more stored datasets. Upon information and belief, Suno's repository of sound recordings functions as a permanent database or central library of copyrighted works. Suno has, at all times following its first training event, maintained this enduring database or centralized library of the works it used to train its commercial AI models. This library, which includes many of Plaintiffs' copyrighted works, was not merely a byproduct of any single training run. Rather, it is a durable, reusable asset that Suno assembled through wholesale, unauthorized copying. Having amassed it, Suno can and does draw on that library as it sees fit—including to train and retrain successive generations of its models, to fine-tune and test its existing models, and to develop new commercial products and features—each an additional unauthorized use of Plaintiffs' recordings.

63. Notably, in announcing v6 and the forthcoming retirement of its prior models, Suno did not claim that it has destroyed the corpus of unlicensed recordings it copied, the datasets derived from that corpus, or the prior models and their weights, which embody what those models learned from Plaintiffs' recordings. On information and belief, Suno retains all these materials and continues to use them to develop, evaluate, fine-tune, and improve its products, including v6. On information and belief, Suno also maintains data associating user-generated outputs and their preference signals with the models, weights, and training materials used to generate them, such that even a model not directly trained on Plaintiffs' recordings is informed by, and benefits from, Suno's retained unauthorized copies. v6 thus rests on a foundation of unauthorized copies of Plaintiffs' works that Suno continues to hold and exploit, and Suno's use of those retained copies to develop, evaluate, and improve v6 is itself a continuing unauthorized use of the Copyrighted Recordings.

**Suno Scraped Copyrighted Recordings from YouTube**

64. Suno acquired many (if not all) of the copyrighted sound recordings in its training data by illicitly downloading them from YouTube using a notorious method of music piracy known

as “stream ripping.”

65. YouTube is a popular platform for sharing audiovisual content with users. YouTube allows users to “stream” content—playing it as it is retrieved—but, as set forth below, it is not designed to allow and actually prohibits making permanent, unrestricted copies of the content it streams. Plaintiffs upload certain of their copyrighted sound recordings to the Official YouTube Channels for specific artists on YouTube. When doing so, Plaintiffs include information in the description for each copyrighted recording conspicuously identifying their copyrighted status, including the name of the record label that provided the recording, the copyright owner, and the unmistakable “P in a circle,” ℗, the international symbol for a copyrighted sound recording.

66. Like many other music streaming services, YouTube’s Terms of Service generally prohibit the unauthorized use of recordings available on its platform.[36] *See Green v. United States Dep’t of Just.*, 111 F.4th 81, 89 (D.C. Cir. 2024) (“[M]any subscription-based video or music streaming services protect their copyrighted . . . music from unauthorized access by . . . encrypting the accessed media to prevent unauthorized copying.”). While YouTube facilitates streaming music and offers a substantially restricted download feature for paying subscribers, it does not permit downloading and making permanent, unrestricted copies of the content on the platform. In fact, YouTube employs enhanced technological measures to protect against unauthorized downloading and copying of licensed content, such as Plaintiffs’ sound recordings. Specifically, YouTube employs a “rolling cipher” encryption measure to control access to such content, preventing external sites or services from directly downloading protected media files. YouTube maintains two different URLs for any given video: the page URL, visible to the user, is for the webpage where the video playback occurs, and the file URL, not visible to the user, is for the video file itself that is played within the page. The file URL is encrypted using a complex and periodically changing algorithm—the “rolling cipher”—that is designed to impede external access to the underlying YouTube video files, thereby preventing or inhibiting any downloading, copying,

---

[36] YouTube, *Terms of Service*, *available at* https://www.youtube.com/static?template=terms.

or distribution of the videos. In simple terms, the rolling cipher effectively controls a user's access to copies of copyrighted works uploaded to the platform and prevents an ordinary user from creating a permanent, unrestricted download of a sound recording made available on YouTube only for streaming and restricted downloading.

67. Even though YouTube periodically revises the rolling cipher by design, there are illicit tools and services that circumvent the encryption, download audiovisual content available on YouTube, and create copies that can be downloaded and further distributed by users without restriction. This process is commonly known as scraping or "stream ripping." The use of digital tools to circumvent YouTube's rolling-cipher measure and download unrestricted copies of copyrighted content made available on YouTube only for streaming and restricted downloading independently violates copyright law. *See UMG Recordings, Inc. v. Kurbanov*, 2021 WL 6492907, at *9 (E.D. Va. Dec. 16, 2021), *report and recommendation adopted*, 2022 WL 20417526 (E.D. Va. Feb. 10, 2022) (noting that "[m]ultiple courts have found that [a] Defendant's Websites are illegal for their stream-ripping functionality.").

68. Nevertheless, Suno utilized such tools—in particular, tools known as YT-DL and YT-DLP—to circumvent YouTube's encryption and scrape copyrighted recordings from YouTube. Indeed, this unlawful step of stream-ripping is the key means by which Suno engages in its first infringing act of reproducing Plaintiffs' sound recordings.

69. Suno's own internal records confirm this scraping operation. In July 2026, the news outlet 404 Media reported that it had reviewed Suno's source code, dating from 2023 and 2024, that spells out Suno's data acquisition activities.[37] According to that report, Suno's scraping instructions directed collection from sources including "genius_hq, youtube_music, freesound, jamendo, imp, deezer, ytm_tagged," with a notation that "non-music will be filtered out." A file named "youtube_music" recorded that Suno had ingested "2,013,545 music clips" as of its last update, and Suno's dataset logs recorded 113,879 hours of audio from YouTube Music and an

[37] Jason Koebler, *Hack Reveals Suno AI Music Generator Scraped YouTube, Deezer, and Genius*, 404 Media (July 15, 2026).

additional 152,162 hours of tagged YouTube Music audio. *Id.* The reporting further revealed that Suno routed its scraping through commercial proxy servers to mask the origin of its requests—concealment consistent with Suno's knowledge that its copying was unlawful. *Id.* Confronted with this reporting, Suno did not deny what the code revealed. It responded only that the materials were "outdated source code that is no longer in use," thereby conceding the code's authenticity and Suno's use of these materials to train its models. *Id.*

70. Suno's unauthorized extraction, copying, and storage of Plaintiffs' Copyrighted Recordings from YouTube for use in its training data was accomplished by Suno's unlawful circumvention of YouTube's rolling cipher and any other technological measures YouTube may have implemented to prevent the downloading and copying of licensed content.

71. Suno's actions constitute a breach of the Copyright Act's anti-circumvention provisions, which state, among other things, that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A).

**The Scale of Suno's Infringement**

72. Since Suno's launch, Plaintiffs have sought to determine which of their sound recordings Suno copied and used to train its AI models. Given the sheer volume of data required to train AI models of the kind deployed by Suno, Plaintiffs reasonably inferred that Suno's training dataset must have included their copyrighted sound recordings. On April 25, 2024, Plaintiffs sent a letter to Suno requesting that it (1) cease and desist from copying or otherwise using their copyrighted sound recordings, and (2) provide a complete list of all of the materials that it used to develop its AI models. Suno refused to provide Plaintiffs with any information regarding the source or substance of its training data.

73. Given Suno's refusal to disclose any information regarding the contents of its training data, Plaintiffs designed a test before initiating the Original Action that revealed some of their copyrighted recordings that Suno copied into its training data. Specifically, Plaintiffs found that certain patterns of prompts can cause Suno's product to generate digital music files that

contain melodic and vocal similarities to well-known copyrighted sound recordings. Following this painstaking trial and error, Plaintiffs used those similarities in the prior pleadings as evidence to demonstrate that Suno trained its models on their copyrighted works.

74. Since then, discovery in the Original Action has clarified the scale of Suno's infringement. As described in public filings in the Original Action, Plaintiffs were able to inspect Suno's source code and training data in a controlled environment in secured rooms located within the office of Suno's outside counsel. Given the extraordinary volume of data at issue, Plaintiffs developed a systematic process for identifying their specific copyrighted works within Suno's training dataset. This process involved employing Audible Magic, an industry-standard audio fingerprinting technology widely used to identify copyrighted audio content.

75. Courts have recognized Audible Magic as a reliable means of identifying copyrighted audio content and have described its technology as "the most effective available means of content-recognition filtering based on recognizing the unique content of . . . [a recording] and detecting and preventing copying of that content." *Arista Records LLC v. Lime Wire LLC*, 2010 WL 10031251, at *6 (S.D.N.Y. Aug. 9, 2010). Suno itself has partnered with Audible Magic to help identify outputs created using its service.[38]

76. Audible Magic functions by comparing an unidentified audio file (*e.g.*, audio files Suno scraped to compile its training data) to a database of audio fingerprints—in essence, mathematical representations or digital signatures—derived from sound recordings that have been provided to Audible Magic by copyright holders. Each archived fingerprint in the Audible Magic database is unique to a particular sound recording. To identify unknown audio files, users of Audible Magic produce fingerprints of the unknown files and compare those fingerprints to the archived fingerprints stored in Audible Magic's content recognition database. If the audio fingerprint associated with an unknown audio file matches an archived fingerprint in Audible Magic's database, then the unknown audio file reproduces (and matches with) the sound recording

[38] Team Suno, *Suno Partners with Audible Magic*, Suno (Oct. 18, 2024), https://suno.com/blog/suno-partners-with-audible-magic.

from which the archived fingerprint was derived. In the ordinary course of business, Plaintiffs regularly provide their copyrighted sound recordings to Audible Magic to be fingerprinted and used in its content recognition database. Audible Magic is in possession of a copy of each of the Copyrighted Recordings.

77. In the discovery process in the Original Action, Plaintiffs created audio fingerprints of the audio files within Suno's training data and transmitted those fingerprints to Audible Magic to analyze whether they match fingerprints stored in the content recognition database. Using this process, Plaintiffs identified ***millions*** of audio files in Suno's training data that matched sound recordings that Plaintiffs or their affiliates own or control, including without limitation the Copyrighted Recordings.

78. Plaintiffs reviewed these voluminous Audible Magic match results from Suno's training data and identified a subset of works for which they assert claims in this action. Plaintiffs have disclosed this subset of works on the public docket in the Original Action. However, the scope of Suno's infringement goes far beyond the 60,202 works listed in Exhibit A, which represent only a fraction of Suno's illegal activity. Plaintiffs expressly reserve the right to expand the list of Copyrighted Recordings to capture the full scope of Suno's illegal reproduction and use of their copyrighted sound recordings.

**Suno Cannot Claim Fair Use**

79. Suno has attempted to justify its pervasive illegal copying of Plaintiffs' sound recordings by claiming fair use.

80. The fair use doctrine has been coined an "equitable rule of reason" that balances various contextual factors to determine whether an unauthorized use of a copyrighted work is "fair." *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 448 (1984). But Suno cannot launder its conscious stealing of the Copyrighted Recordings for commercial gain with an appeal to equitable principles. Suno understands that what it is doing is wrong and inequitable, which explains why it refused to even acknowledge the extent of its unauthorized use of Plaintiffs' sound recordings, and why it tries to cover its tracks when users publicize outputs that clearly reflect

training on their recordings. And, in any event, fair use is not a defense for breach of the Copyright Act's anti-circumvention provisions. *See Green*, 111 F.4th at 98 ("Fair use has never been held to be a guarantee of access to copyrighted material in order to copy it by the fair user's preferred technique or in the format of the original." (citation and internal quotation mark omitted)).

81. Suno's conduct violates the very purposes of the copyright law and runs contrary to the purpose animating the fair use doctrine. The Copyright Act codifies the common-law doctrine of fair use in 17 U.S.C. § 107, which identifies examples of the types of uses that may qualify as fair, including "criticism, comment, news reporting, teaching . . . scholarship, or research." These paradigmatic fair uses reflect the policy of ensuring public availability of "literature, music, and other arts" so that other humans can draw on those works to create new ones. Suno's wholesale copying of countless recordings serves none of these purposes. Suno's service does not offer "commentary" or "scholarship" or promote human authorship. Rather, Suno's service copies and ingests copyrighted works to create computer-generated imitations of human expression that do not merit copyright protection. Suno's motive is brazenly commercial and threatens to displace the genuine human artistry that is at the heart of copyright protection.

82. Moreover, applying the statutory fair use factors set forth in § 107 demonstrates that Suno's conduct fails to qualify as fair use. These factors are: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.

83. The first fair use factor focuses on "the problem of substitution—copyright's bête noire." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023). "The use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for . . . the work," and thus is less likely to constitute fair use. *Id.*

84. Suno claims its product can produce "radio-quality music,"[39] and encourages paid users to post their outputs to "platforms expressly designed to commercialize music."[40] In furtherance of this objective, Suno copies Plaintiffs' catalogs of sound recordings and generates digital music files that are designed to entertain, evoke emotion, and stoke passion, just like the genuine sound recordings on which Suno was trained. Suno feeds the Copyrighted Recordings into its AI models not merely to deconstruct their expressive content, but with the explicit aim of imitating these expressive features in digital music files that could serve as substitutes for and compete with the original recordings.

85. The use here is far from transformative, as there is no functional purpose for Suno's AI models to ingest the Copyrighted Recordings other than to spit out new, competing music files. Indeed, Suno's goal was to leverage the Copyrighted Recordings so it could reliably replicate popular music and build a commercially viable product targeting the same consumers who enjoy the sound recordings it unlawfully used to build its product. That Suno is copying the Copyrighted Recordings for a commercial purpose, and is deriving revenue directly proportional to the number of music files it generates, further tilts the first fair use factor against it. *See Andy Warhol*, 598 U.S. at 532–3 ("If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying.").

86. Suno's own conduct refutes its claim that its technology is transformative. When Plaintiffs filed the Original Action, Mr. Shulman publicly insisted that Suno's technology "is designed to generate completely new outputs, not to memorize and regurgitate pre-existing content," and offered as proof that "[t]hat is why we don't allow user prompts that reference specific artists."**[41]** Irrespective of Suno's claim that it is capable of generating "completely new outputs," Suno is aggressively marketing its service and the outputs therefrom in the marketplace,

---

[39] Suno Blog – v3, *supra note* 16.

[40] @keenan, Discord (Oct. 1, 2023).

**[41]** Robinson, *supra note* 4.

with the explicit intention of attracting listeners, encouraging consumption, and competing in the very same markets as the recordings it used to train. And Suno has since abandoned its prohibition on artist-name prompts. Today, when a user prompts Suno's service with the name of a specific recording artist, the service does not reject the prompt; rather, by Suno's own account, it accepts the request and "redirect[s]" it "toward descriptive musical characteristics."[42] In other words, Suno's service now translates an artist's name into a description of that artist's distinctive sound and delivers music to match. This mechanism exposes the conceit behind Mr. Shulman's representation. Suno can maintain a correspondence between an artist's name and that artist's "descriptive musical characteristics" only because its models learned the distinctive sounds that define the copyrighted recordings Suno copied. And the removal of the artist's name from the prompt changes nothing about how users interact with Suno's service when prompting it with artist names. The prohibition on artist-name prompts thus never reflected the purpose of Suno's service or how Suno's technology was "designed." Instead, it was a fig leaf to conceal what the models had learned. Once Suno concluded that users wanted artist-specific outputs, it made the business decision to facilitate the generation of the very artist-specific imitations Mr. Shulman previously claimed Suno's technology could not produce. Suno's models could always trade on the identities and works of specific artists. Suno simply concealed that capability until it found a way to sell it.

87. The second fair use factor also favors Plaintiffs. This factor recognizes that "certain 'works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied.'" *TCA TV Corp. v. McCollum*, 839 F.3d 168, 184 (2d Cir. 2016) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994)). There is no doubt that the Copyrighted Recordings are the type of "creative expression for public dissemination [that] falls within the core of the copyright's protective purposes." *Hachette Book Grp., Inc. v. Internet Archive,* 664 F. Supp. 3d 370, 387 (S.D.N.Y. 2023) (quoting *Campbell*, 510 U.S. at 586).

[42] Mikey Shulman, *How We're Building the Future of Music Responsibly*, Suno (Aug. 6, 2026).

88. So too does the third fair use factor weigh against fair use. "A finding of fair use is more likely when small amounts . . . are copied than when the copying is extensive, or encompasses the most important parts of the original." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 221 (2d Cir. 2015). Suno copies the entirety of the protected sound recordings it sweeps into its training data. Suno then uses these copies of protectable expression to generate audio outputs that resemble the Copyrighted Recordings it ingests.

89. Turning to the fourth factor, Suno's use of Copyrighted Recordings poses a significant threat to the market for and value of the Copyrighted Recordings. Licensing is at the core of Plaintiffs' businesses, and Plaintiffs license the Copyrighted Recordings for myriad purposes, including for use in emerging technologies such as streaming services, user-generated content platforms, and other innovative technologies. Suno's unauthorized use of the Copyrighted Recordings threatens to eliminate the existing market for licensing sound recordings, as well as the market for licensing sound recordings to generative AI companies. Rather than license copyrighted recordings, potential licensees interested in licensing copyrighted recordings for their own purposes could generate an AI-soundalike at virtually no cost. This is an especially aberrant result when the replacement audio file is generated using an AI service, like Suno's, that produced the replacement by infringing the copyrighted recording that would otherwise have been licensed. The issue is compounded as the AI-generated outputs compete for consumer engagement and listening time on the very platforms where the recordings used to train are legally available.

90. Suno's own conduct in the marketplace, along with the many other executed agreements to license sound recordings as training data for generative AI models, removes any doubt that a licensing market to use sound recordings as training data exists and that Plaintiffs are entitled to exploit it. Suno itself has entered into an agreement with former plaintiff Warner Music Group to license copyrighted works as training data for its own generative AI models. And this agreement is much more than a simple settlement of past claims. In Mr. Shulman's own words: "I don't think of what we did [with Warner] as a settlement . . . . I think about this much more like

a partnership . . . . It is much more long term."[43]

91. More recently, Suno announced a "landmark global partnership" with BMG, a major rightsholder that had never sued Suno. The agreement spans BMG's recorded music and publishing repertoire and is, by Suno's own description, "part of our upcoming launch of our first music model developed with the music industry"—that is, a license to use copyrighted works as training data for precisely the kind of generative AI models at issue in this case.[44]

92. On September 8, 2026, Suno announced a third such partnership, with Believe, one of the world's largest digital music companies, whose participating catalog Suno likewise used to train its models.[45] Suno has thus repeatedly paid for training rights (and, upon information and belief, is actively negotiating with other rightsholders over these same rights) with willing counterparties. A company that pays to license the very inputs at issue cannot credibly maintain that no market exists for those inputs, or that any such market is too speculative to be cognizable.

93. Suno's repeated participation in this market also repudiates Suno's position that no viable market exists for licensing sound recordings as training data for generative AI models. Suno cannot credibly deny the existence of a market in which it is now a repeat, paying participant. And while Suno has announced plans to compensate the business partners with whom it has executed licenses, it nevertheless continues to allow users to access, use, consume, and interact with the outputs of its unlicensed models. As alleged above, Suno continues to exploit the outputs and associated user interactions that are a product of its unauthorized model training to improve v6. All the while, Suno has paid Plaintiffs and their artists nothing for the copyrighted works from which those models and outputs were built.

94. The fourth factor encompasses harm to any "traditional, reasonable, or likely to be developed" market for a copyrighted work, *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994), including derivative markets that "creators of original works would in general

[43] Robinson, *supra* note 5.

[44] Shulman, *supra* note 9; *see also* BMG Press Release, *supra* note 10.

[45] Believe Press Release, *supra* note 11.

develop or license others to develop," *Campbell*, 510 U.S. at 592. The market for licensing sound recordings as training data for AI models is precisely such a market: it is one Plaintiffs are actively participating in, one Plaintiffs reasonably expect to continue to exploit and further develop, and one whose existence Suno has confirmed by paying to participate in it.

95. The market for procuring and using copyrighted works in connection with generative AI is concrete, dynamic, and not hypothetical. Underscoring the existence of this currently viable and emerging licensing market, myriad other rightsholders have executed licensing agreements with respect to various types of copyrighted works—spanning sound recordings, musical compositions, literary works, news articles, visual works, and others—in the training and outputs of generative AI models. These ready indications of a vibrant licensing market dispose of any suggestion that requiring Suno to pay for its use of Plaintiffs' recordings would presume the existence of a market that rightsholders cannot reasonably expect to exploit. As the Second Circuit has explained, an unauthorized use is "less fair" precisely "when there is a ready market or means to pay for the use." *Texaco*, 60 F.3d at 931. Here, a ready licensing market exists and allowing Suno to take Plaintiffs' recordings for free would destroy it. No rational company will pay for what it can take for free. If Suno's unauthorized use is deemed permissible and establishes a norm of unpaid sourcing, storage, copying, and other use of copyrighted sound recordings associated with generative AI, it would usurp the legitimate licensing market and eliminate all incentives to pay for a license for copyrighted sound recordings to train AI models. In short, Suno's conduct threatens to foreclose this licensing market and stunt its continued growth.

96. Suno understood from the outset that licensing was available, yet it simply chose not to pursue rightsholder consent. Speaking publicly about the Original Action in January 2025—many months after Suno had copied Plaintiffs' recordings, trained its models on them, launched and monetized its service, and been sued—Mr. Shulman remarked that "[i]t just seems silly to throw a bunch of venture dollars at lawyers instead of sitting down and talking about how you

could work together."[46] Yet, at no point before copying Plaintiffs' recordings or first using them to train its AI models did Suno attempt to "sit down" with Plaintiffs to seek permission. To the contrary, Suno concluded that striking a deal *ex ante* was not in its financial interest. As Suno's principal early investor put it, Suno "needed to make this product without the constraints" of copyright law.[47] The only negotiation Suno envisioned was one that would take place *after* Suno engaged in industrial-scale infringement, so that any discussion with rightsholders would concern asking for forgiveness, rather than paying for permission. At bottom, Suno's grievance is that Plaintiffs insisted on consideration and respect for their artists and fundamental tenets of copyright law before Suno's mass-scale theft of their copyrighted sound recordings. Suno's subsequent licensing agreements with Warner Music Group, BMG, and Believe confirm that when Suno finally chose to "sit down" with rightsholders, a license was possible, just as it was from the start.

97. Anticipating the implications of these agreements for this action, Suno has sought to recharacterize them as something other than what they are. Suno's Chief Product Officer, Jack Brody, has insisted that its partners' revenue share is "not in exchange for training" and that the deals are "not really about the data"—even while Suno confirms that it used its partners' catalogs to train v6, that compensation flows to the partners supplying the training data, and, in Mr. Shulman's words, that Suno "will be licensing works" for the remixing and sampling products it is building with those partners.[48] The substance of these deals belies Suno's self-serving characterization. At bottom, Suno takes its partners' recordings as training inputs and pays the rightsholders who supply them. That is a functioning licensing market, whatever nomenclature Suno adopts for litigation purposes.

98. Suno's own Terms of Service confirm that Suno understands that using recorded content to train a generative AI model requires a license from the owner of that content. In the

---

[46] Stuart Dredge, *Suno Boss Targets 'Bigger, Brighter Future' With Music Industry*, Music Ally (Jan. 14, 2025).

[47] Hiatt, *supra note 6.*

[48] Kristin Robinson, *Suno Launches First AI Music Models "In Partnership With the Music Industry,"* Billboard Pro (Sept. 9, 2026).

Terms of Service operative in January 2024, more than four months before Plaintiffs initiated the Original Action, Suno required every user of its service to "grant to Suno . . . a worldwide, non-exclusive, fully paid-up, sublicensable . . . assignable, royalty-free, perpetual, irrevocable right and license to use, reproduce, store, modify, distribute, create derivative works based on, perform, display, communicate, transmit, and otherwise make available any and all [user-submitted] Content in connection with the provision, use, monetization, promotion, marketing, and improvement of our products and services[.]" This mandatory license persists in Suno's current Terms of Service.[49] In other words, Suno ensures it has secured permission before it will train or improve its service using content contributed by its own users. Yet, Suno copied Plaintiffs' commercially released sound recordings to train the very same models without seeking permission from Plaintiffs. That Suno demands a license to train on the material its users upload, while helping itself to Plaintiffs' recordings for free, confirms both that Suno knew a license was required and that its infringement of Plaintiffs' rights was knowing and willful.

99. Moreover, Suno's product generates directly competing digital music files at such speed that it risks overrunning the market for human-made sound recordings, including the Copyrighted Recordings, on which it was trained. This is not hyperbole and the market is already experiencing this flood. Suno is aware of and has sought to capitalize on the dilutive capacity of its AI service. As described above, when Suno realized that its users wanted to prompt its service with the names of popular recording artists, it abandoned that prohibition on such prompts. That reversal was a strategic business decision reflecting Suno's understanding that its users want to generate outputs that resemble popular sound recordings—like Plaintiffs' copyrighted sound recordings—and Suno's choice to serve that demand with machine-generated imitations. Suno's outputs are highly commercial by design; indeed, Suno touts its ability to generate commercially viable outputs that necessarily attract listener time and engagement at the expense of genuine, human-created sound recordings. If Suno did not have the ability to generate outputs with these

[49] Suno, *Terms of Service*, https://suno.com/terms.

characteristics, its business model would collapse. In addition, direct engagement with Sunos's service, including listening to outputs on Suno's platform, diminishes the market for Plaintiffs' recordings.

100. The pace of Suno's outputs is staggering—Suno has presented to investors the fact that users on Suno's platform create a Spotify catalog's worth of outputs every two weeks. Suno's Terms of Service authorize paid subscribers to exploit their outputs commercially.[50] Users have taken the cue by publishing Suno-generated outputs to music streaming services, where those outputs compete against real, copyrighted sound recordings for plays, finite listener attention, and shares of the same royalty pools that compensate genuine artists. Suno touts the virality and reach of its outputs on music streaming services. As one example, Suno advertised to investors that the AI act "The Velvet Sundown" used Suno to generate outputs that went "viral off platform."[51] The Velvet Sundown notably amassed over a million monthly Spotify listeners in the summer of 2025 before the public learned the music was machine-made.[52]

101. Deezer, a major music streaming service, reported in July 2026 that AI-generated tracks had for the first time exceeded half of all daily new music deliveries to its platform—roughly 90,000 machine-generated tracks arriving every day, up from approximately 39 percent of daily deliveries just six months earlier.[53] Suno, the self-proclaimed leader in AI music generation, is a principal engine of this deluge. Every machine-generated track delivered to a streaming service competes with the Copyrighted Recordings for placement, for discovery, for finite listener attention, and for a share of the fixed royalty pools from which genuine artists and rightsholders are paid. Dilution at this scale and velocity is not just a future harm; it is a present, measured, and accelerating one.

102. Mr. Shulman has predicted where Suno's market success leads, having expressed

---

[50] *Id.*

[51] Robinson, *supra note* 3.

[52] Tara Bellucci, *The Velvet Sundown: The AI Band Controversy Explained*, Berklee (July 22, 2025).

[53] Wendel, *supra* note 2.

his view that "increasingly taste is the only thing that matters in art and skill is going to matter a lot less."[54] The skill that Mr. Shulman diminishes is the skill that recording artists employed to create the Copyrighted Recordings. And Suno is designed to devalue that skill by replacing it with a technological service that can effortlessly supply that skill on demand. But the only reason it can do so is because it was built by copying the recordings of the human artists who applied their skill and talent to create the recordings Suno stole as raw material for its AI models. A market in which skill matters less is a market in which the recordings embodying that skill are worth less.

103. This dilution of the market for Plaintiffs' sound recordings by a flood of machine-generated substitutes is precisely the injury the fourth factor exists to capture. The question for purposes of the fourth fair use factor is not merely the harm from Suno's conduct alone, but whether "unrestricted and widespread conduct of the sort engaged in by [Suno] would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590. It plainly would. Courts assessing the use of copyrighted works to train generative AI have recognized that such training inflicts cognizable market harm "by helping to enable the rapid generation of countless works that compete with the originals," irrespective of whether the resulting outputs are themselves infringing. *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1043 (N.D. Cal. 2025). And the competition Suno enables is far removed from the ordinary competition that copyright tolerates: Suno's models are "better able to generate" competing audio outputs "because they are trained on the creative expression in" Plaintiffs' recordings, so "this competition is not 'legitimate.'" *Id.* at 1044. A service that can produce "literally millions of secondary works, with a miniscule fraction of the time and creativity used to create the original works it was trained on," *id.* at 1055, threatens to dilute and ultimately overwhelm the very market for the genuine recordings on which it was built. Suno's blatant theft of vast amounts of copyrighted recordings to train its AI models cannot be considered fair use because it is "directly aimed at replacing the work of human artists with massive quantities of AI-created

[54] 20VC Podcast, *supra note* 1, at 51:55-52:00.

'sounds' . . . that substantially dilute the royalty pools that are paid out to artists."[55]

104. Nor is the fourth factor inquiry confined to Suno's service as currently configured. A ruling that copying copyrighted sound recordings to train a generative music model is fair use would license all conduct of the same type: any AI developer (including those that adopt none of the voluntary restrictions Suno has supposedly professed) could copy Plaintiffs' entire catalogs to build ever more sophisticated services generating ever closer substitutes for the recordings on which they trained. Suno's own conduct shows that such self-imposed limits are business decisions, not legal constraints, discarded the moment they no longer serve the developer's commercial interests. For example, just as Suno abandoned its prohibition on artist-name prompts once it concluded that users wanted exactly what the prohibition withheld.

105. The harm Suno is causing goes far beyond these immediate economic consequences. Suno's wholesale theft of the Copyrighted Recordings threatens the entire music ecosystem and the numerous people it employs. It also degrades the rights of artists to control their works, determine whether future uses of their works align with their aesthetic and personal values, and decide the products or services with which they wish to be associated. And it propagates the destructive theory that copyrighted music is free for the taking whenever a new technology claims that seeking and obtaining permission is just too cumbersome. Suno's leadership has been candid that its business diminishes the incentives behind human creativity. As Mr. Shulman explained, "[i]t's not really enjoyable to make music now . . . [i]t takes a lot of time, it takes a lot of practice, you need to get really good at an instrument or really good at a piece of production software. I think the majority of people don't enjoy the majority of the time they spend making music."[56] The time, practice, and skill Mr. Shulman derides are exactly what copyright law exists to encourage and reward, and exactly what spurred the creation of the Copyrighted Recordings Suno copied and ingested into its AI models. Suno's entire business is built on a

---

[55] Artist Rights Alliance, *200+ Artists Urge Tech Platforms: Stop Devaluing Music*, Medium (Apr. 1, 2024), https://artistrightsnow.medium.com/200-artists-urge-tech-platforms-stop-devaluing-music-559fb109bbac.

[56] 20VC Podcast, *supra* note 1, at 23:26-23:41.

contradiction: it dismisses the human labor of making music as friction to be engineered away, while depending entirely on the recordings that are the product of such labor to build its product in the first place. In other words, Suno's conduct is a frontal attack on the very purpose of copyright law to reward authors and promote their incentives to continue creating copyrighted works.

106. There is room for AI and human creators to forge a sustainable, complementary relationship that promotes human creativity and facilitates the human creations that shape culture, excite the public, and resonate with consumers. This can and should be achieved through the well-established mechanism of free-market licensing that ensures proper respect for copyright owners. Like the other AI technologies that have struck licensing deals with copyright owners, copyright law mandates that Suno do the same if it wishes to build a business using the Copyrighted Recordings.

107. Since the day it launched, Suno has flouted the rights of copyright owners in the music industry as part of a mad dash to become the dominant AI music generation service. Neither Suno, nor any other generative AI company, can be allowed to advance toward this goal by trampling the rights of copyright owners.

## **CLAIMS FOR RELIEF**

## **FIRST CAUSE OF ACTION**

### **(Direct Infringement of Post-1972 Copyrighted Recordings)**

108. Plaintiffs repeat, reallege, and incorporate the allegations in paragraphs 1–107 as if fully set forth herein.

109. Plaintiffs UMG and Capitol own or exercise exclusive control over rights in the Universal Works, which are an illustrative and non-exhaustive list of some of Universal's works infringed by Defendant through its development of Suno's service. Universal has duly registered each of the Universal Works.

110. Plaintiffs SME, Alamo, Arista Music, Arista Records, LaFace, Records Label, SME US Latin, Ultra, Volcano, and Zomba own or exercise exclusive control over rights in the

Sony Works, which are an illustrative and non-exhaustive list of some of Sony's works infringed by Defendant through its development of Suno's service. Sony has duly registered each of the Sony Works.

111. Suno has knowingly infringed Plaintiffs' exclusive rights in copyrighted sound recordings, including but not limited to the Universal Works and the Sony Works, by reproducing them in violation of 17 U.S.C. § 106(1).

112. Suno does not have authorization, permission, license, or consent to reproduce or otherwise use the Universal Works or the Sony Works.

113. Suno used the reproductions of the Universal Works and the Sony Works to train its generative AI models. Suno also stores copies of the Universal Works and the Sony Works for use in connection with post-training, model refinement, product development—including, on information and belief, the development of its v6 models—and to otherwise serve its commercial interest and business needs. Suno has stored and maintained copies of Plaintiffs' works at all times following its first training event.

114. Each of Suno's acts of infringement of the Universal Works and the Sony Works is a willful violation of 17 U.S.C. § 106.

115. As a direct and proximate result of Suno's infringement of Plaintiffs' exclusive rights, Suno has caused and will continue to cause irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law. Plaintiffs are therefore entitled to injunctive relief and to either actual damages and Suno's profits or statutory damages pursuant to 17 U.S.C. § 504(c), together with Plaintiffs' costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

## SECOND CAUSE OF ACTION

### (Direct Infringement of Pre-1972 Recordings)

116. Plaintiffs repeat, reallege, and incorporate the allegations in paragraphs 1–107 as if fully set forth herein.

117. Plaintiffs UMG and Capitol own or exercise exclusive control over rights in the Universal Works, which are an illustrative and non-exhaustive list of some of Universal's works

infringed by Defendant through its development of Suno's service. All of the pre-1972 Universal Works have been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

118. Plaintiffs SME, Alamo, Arista Music, Arista Records, LaFace, Records Label, SME US Latin, Ultra, Volcano, and Zomba own or exercise exclusive control over rights in the Sony Works, which are an illustrative and non-exhaustive list of some of Sony's works infringed by Defendant through its development of Suno's service. All of the pre-1972 Sony Works have been submitted to and publicly indexed by the U.S. Copyright Office pursuant to 17 U.S.C. § 1401.

119. Suno has knowingly infringed Plaintiffs' exclusive rights in copyrighted sound recordings, including but not limited to the Universal Works and the Sony Works, by reproducing them in violation of 17 U.S.C. §§ 106(1) and 1401(a)(1).

120. Suno does not have authorization, permission, license, or consent to reproduce or otherwise use the Universal Works or the Sony Works.

121. Suno used the reproductions of the Universal Works and the Sony Works to train its generative AI models. Suno also stores copies of the Universal Works and the Sony Works for use in connection with post-training, model refinement, product development—including, on information and belief, the development of its v6 models—and to otherwise serve its commercial interest and business needs. Suno has stored and maintained copies of Plaintiffs' works at all times following its first training event.

122. Each of Suno's acts of infringement of the Universal Works and the Sony Works is a willful violation of 17 U.S.C. § 106.

123. As a direct and proximate result of Suno's infringement of Plaintiffs' exclusive rights, Suno has caused and will continue to cause irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law. Plaintiffs are therefore entitled to injunctive relief and to either actual damages and Suno's profits or statutory damages pursuant to 17 U.S.C. § 504(c), together with Plaintiffs' costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

## THIRD CAUSE OF ACTION

**(Circumvention of Technological Measures)**

124. Plaintiffs repeat, reallege, and incorporate the allegations in paragraphs 1–107 as if fully set forth herein.

125. Plaintiffs UMG and Capitol own or exercise exclusive control over rights in the Universal Works, which UMG and Capitol have uploaded to YouTube.

126. Plaintiffs SME, Alamo, Arista Music, Arista Records, LaFace, Records Label, SME US Latin, Ultra, Volcano, and Zomba own or exercise exclusive control over rights in the Sony Works, which Sony has uploaded to YouTube.

127. By "stream ripping" audio files from YouTube, Suno circumvented technological measures implemented by YouTube that effectively control access to copyrighted works in violation of 17 U.S.C. § 1201(a). Specifically, Suno employed code to access, extract, copy, and download audio files of the Universal Works and the Sony Works from YouTube without the authorization of Plaintiffs or YouTube, and in violation of YouTube's Terms of Service.

128. Plaintiffs have been harmed by Suno's violations of 17 U.S.C. § 1201(a), including because Suno's circumvention of YouTube's technological measures has facilitated Suno's ongoing and mass-scale infringement of Plaintiffs' copyrights through its unauthorized use of the Universal Works and the Sony Works in its training data.

129. Suno's conduct in violation of 17 U.S.C. § 1201(a) as described herein was and is willful, intentional, and purposeful, in disregard of the rights of Plaintiffs.

130. As a direct and proximate result of Suno's violations of 17 U.S.C. § 1201(a), Plaintiffs are entitled to either the maximum statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(A) or, in the alternative, their actual damages pursuant to 17 U.S.C. § 1203(c)(2), including Suno's profits from circumvention in amounts to be proven at trial, together with Plaintiffs' costs and reasonable attorneys' fees pursuant to 17 U.S.C. §§ 505 and 1203(b)(4), (5).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request a judgment in their favor and against Suno as follows:

A. For a declaration that Suno has willfully infringed Plaintiffs' protected sound recordings, including the Universal Works and the Sony Works.

B. For such equitable relief under Title 17, Title 28, and/or the Court's inherent authority as is necessary to prevent or restrain infringement of Plaintiffs' protected sound recordings, including a preliminary and permanent injunction requiring that Suno and its officers, agents, servants, employees, attorneys, directors, successors, assigns, licensees, and all others in active concert or participation with any of them, cease circumventing YouTube's technological measures and infringing, or causing, aiding, enabling, facilitating, encouraging, promoting, inducing, or materially contributing to or participating in the infringement of any of Plaintiffs' exclusive rights under federal law, including without limitation in the sound recordings in Exhibit A;

C. For statutory damages pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum provided by law, arising from Suno's willful violations of Plaintiffs' rights, including in an amount up to $150,000 per work infringed; or, in the alternative, at Plaintiffs' election, Plaintiffs' actual damages and/or Suno's profits from infringement pursuant to 17 U.S.C. § 504(b), in an amount to be proven at trial;

D. For statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(A), in an amount up to the maximum provided by law, arising from Suno's willful circumvention of technological measures in furtherance of its violations of Plaintiffs' rights,

including in an amount up to $2,500 with respect to each act of circumvention; or, in the alternative, at Plaintiffs' election pursuant to 17 U.S.C. § 1203(c)(2), Plaintiffs' actual damages and/or Suno's profits from its circumvention, in an amount to be proven at trial;

E. For an award of Plaintiffs' costs and disbursements in this action, including reasonable attorneys' fees, pursuant to 17 U.S.C. §§ 505 and 1203(b)(4), (5);

F. For an award of pre-judgment and post-judgment interest, to the fullest extent available, on any monetary award made part of the judgment against Suno; and

G. For such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims for which trial by jury is proper.

Dated: September 18, 2026
New York, New York

Moez M. Kaba*
Mariah N. Rivera*
Alexander R. Perry*
**HUESTON HENNIGAN LLP**
1 Little West 12th Street
New York, New York 10014
Telephone: (646) 930-4046
Facsimile: (888) 775-0898
mkaba@hueston.com
mrivera@hueston.com
aperry@hueston.com

Christina V. Rayburn*
**HUESTON HENNIGAN LLP**
620 Newport Center Dr., Suite 1300
Newport Beach, California 92660
Telephone: (949) 356-6412
Facsimile: (888) 775-0898
crayburn@hueston.com

Rajan S. Trehan*
**HUESTON HENNIGAN LLP**
523 West 6th Street, Suite 400
Los Angeles, California 90014
Telephone: (213) 788-4340
Facsimile: (888) 775-0898
rtrehan@hueston.com

By: *Alexandra Arnold*
Alexandra Arnold (BBO #706208)
Daniel J. Cloherty (BBO #565772)
**CLOHERTY & STEINBERG LLP**
One Financial Center, Suite 1120
Boston, Massachusetts 02110
Telephone: (617) 481-0160
Facsimile: (617) 848-0830
dcloherty@clohertysteinberg.com
aarnold@clohertysteinberg.com

**Pro hac vice forthcoming*

*Counsel for Plaintiffs UMG Recordings, Inc., Capitol Records, LLC, Sony Music Entertainment, Alamo Records, LLC, Arista Music, Arista Records, LLC, LaFace Records, LLC, Records Label, LLC, Sony Music Entertainment US Latin, LLC, Ultra Records, LLC, Volcano Entertainment III, LLC, and Zomba Recording LLC*