**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, SONY MUSIC ENTERTAINMENT, ALAMO RECORDS, LLC, ARISTA MUSIC, ARISTA RECORDS, LLC, LAFACE RECORDS, LLC, RECORDS LABEL, LLC, SONY MUSIC ENTERTAINMENT US LATIN, LLC, ULTRA RECORDS, LLC, VOLCANO ENTERTAINMENT III, LLC, and ZOMBA RECORDING LLC,

Plaintiffs,

v.

SUNO, INC., and JOHN DOES 1-10,

Defendants.

Case No.: 1:26-cv-14275-FDS

**PLAINTIFFS' MEMORANDUM OF LAW IN PARTIAL OPPOSITION TO DEFENDANT SUNO, INC.'S MOTION TO STAY**

## I. INTRODUCTION

Plaintiffs agree with Suno that the Court's resolution of the fair use question in *UMG Recordings, Inc. v. Suno, Inc.*, No. 1:24-cv-11611-FDS ("*Suno I*") will, at the very least, be instructive in this case.[1] For that reason, Plaintiffs concur that work-specific discovery into the ownership of the more than 60,000 sound recordings asserted here should be deferred until the Court rules on fair use in *Suno I*. What Plaintiffs oppose is Suno's request that this action be frozen in its entirety, for a period that could realistically extend into 2028, while Suno continues to train, release, license, and monetize models that require independent scrutiny. Since Plaintiffs filed *Suno I* in June 2024, Suno has released six successive model versions, most recently v6 on September 9, 2026, nine days before this action was filed, which the Complaint alleges was trained in part on the outputs of its infringing predecessors and user uploads that could contain Plaintiffs' recordings. Compl. ¶¶ 41–50. Yet, at Suno's insistence, the *Suno I* record stops short of v6.

Suno has taken the position in *Suno I* that the full picture of its 2025 and 2026 models and licensing conduct are outside the scope of that case. It now asks the Court to stay the only action in which that conduct can be examined. Either that conduct is part of the fair use record in *Suno I*, in which case Suno should produce the discovery there, or it is not, in which case the discovery must proceed here. The stay Suno seeks would ensure that discovery on key issues proceeds nowhere, and it would lengthen the life of both cases on the Court's docket. Suno's view of delay has also shifted with its interests. When Plaintiffs sought to add these works to *Suno I*, Suno insisted that any delay in resolving its fair use defense would result in undue prejudice. *Suno I*, Dkt. 237 at 3, 14–19. Now, Suno asks that Plaintiffs wait years to adjudicate its rights and treats that delay as no prejudice at all.

The danger to Plaintiffs is concrete. By the time discovery into v6 could begin under Suno's proposal, the engineers who built the models may have moved on, their recollections will have faded and the training pipelines they used may have changed significantly or been superseded.

[1] Citations to "*Suno I*" refer to the docket in *UMG Recordings, Inc. v. Suno, Inc.*, No. 1:24-cv-11611-FDS (D. Mass.). Citations to "Compl." refer to the Complaint filed in the present action. Dkt. No. 1. Citations to "Ex." refer to exhibits to the accompanying Declaration of Rajan S. Trehan ("Trehan Decl.").

Delay would not merely postpone building the record, it would degrade it. And that cost would fall entirely on Plaintiffs, in an action that only exists because Suno refused to disclose what it copied, which forced Plaintiffs to identify their works through a forensic analysis of Suno's training data and then to bring the resulting claims in a second case. *See Suno I*, Dkt. 1 ¶ 10; Compl ¶ 5. The Court should not exercise its equitable discretion in a way that rewards the party whose obfuscation made two actions concerning the same core conduct necessary in the first place. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936); *Marquis v. F.D.I.C.*, 965 F.2d 1148, 1154–55 (1st Cir. 1992).

Plaintiffs instead propose a partial stay with three components. *First*, discovery to confirm Plaintiffs' ownership and chain of title in the 60,000 newly asserted works would be deferred pending the Court's summary judgment ruling on fair use in *Suno I*. *Second*, tailored discovery would proceed on four subjects the *Suno I* record does not reach: (a) Suno's successor models, including v6, and how they are trained and used; (b) Suno's efforts to license training data; (c) Suno's commercial expansion and business development, including as to new business segments and markets and its subsequent funding rounds; and (d) its recent financial performance. Plaintiffs would in turn provide reciprocal discovery on the market for or value of licensing sound recordings as AI training data and on the effect of AI-generated music on the market for their recordings. *Third*, all discovery taken in *Suno I* would be usable in this action, eliminating the duplication Suno claims to fear. This proposal is intended to serve as a workable starting point. If discovery reveals that more is relevant or required, the parties may return to the Court to discuss reasonable adjustments. The Court should deny the motion to the extent it seeks a complete stay and enter the partial stay Plaintiffs propose.

## II. BACKGROUND

### A. Suno I

Plaintiffs and certain affiliated labels filed *Suno I* in June 2024. The original complaint identified 560 sound recordings as an "illustrative sampling" of the works Suno had copied to train

its models—a limited subset—because Suno refused to disclose the contents of its training data, even after Plaintiffs directly posed that question. *Suno I*, Dkt. 1 ¶¶ 10, 27. Over the ensuing two years, Plaintiffs' forensic analysis of Suno's training corpus revealed that Suno had copied millions of their copyrighted recordings and used them for training. Compl. ¶ 5. Fact discovery on the original infringement claims in *Suno I* has now closed subject to pending disputes and certain outstanding depositions, while discovery on the later-added circumvention claim premised on Suno's method of data scraping continues. *Suno I*, Dkt. 302. The close of all fact discovery is set for November 20, 2026. *Id.* Dispositive motions are due June 22, 2027. *Id.*

### B. The Scope of Discovery in *Suno I*

At Suno's behest, the *Suno I* record extends to Suno's conduct through early 2025 and to its models through v5.5, with only limited discovery into v6. Three features of that record bear on this motion.

*First,* Suno collected documents in February 2025 and has resisted collecting since. When Plaintiffs sought to extend the collection period to the present for discovery concerning Suno's licensing of training data, the markets for its service and outputs, and its development of its most recently released commercial models, Suno responded that "repeating discovery collection and review for the past twelve months is not proportional to the needs of the case." *Suno I*, Dkt. 206 at 12; *see also* Dkt. 209-1 at 10–20. Judge Levenson found that these topics of discovery "do appear relevant" but declined to order a full re-collection, leaving the mechanism for obtaining more recent materials to the parties. *Suno I*, Dkt. 206 at 12–13. Suno has since produced a handful of discrete post-cutoff items but otherwise continues to treat February 2025 as the outer bound of its document discovery.

*Second*, Suno agreed to supplement its interrogatory responses only through v5. *See* Ex. A (B. Lovejoy Feb. 13, 2026 email). Suno has declined to supplement them for v5.5 or later models.

*Third*, Suno's Rule 30(b)(6) depositions in *Suno I* are confined to models through v5.5 and certain aspects of v6. As to v6, Suno offered testimony only on "new features and functionality

Suno publicly announced or is developing as a result of the [Warner] agreement" and on "how Suno's product, model, or training-data composition changed or will change for Version 6." Ex. B (S. Shih July 23, 2026 email). No *Suno I* witness has been designated to testify about how v6 was trained or how it is performing, and no document production or interrogatory response in *Suno I* addresses the training of the current iteration of Suno's models.

### C. The Amendment Order

On May 21, 2026, Plaintiffs moved to amend the *Suno I* complaint to assert 61,026 additional works. *Suno I*, Dkt. 231. Suno opposed, arguing among other things that the amendment would "prolong the litigation and forestall a fair use determination" and that Suno was entitled to a "timely" resolution of its defense. *Suno I*, Dkt. 237 at 3, 14. The Court denied the motion without prejudice, reasoning that adding the works to *Suno I* "will have obvious consequences of complexity and delay" and that "summary judgment on Suno's fair use defense will likely resolve the predominant issue in this case." *Suno I*, Dkt. 272 ("Amendment Order") at 2–3. The Court was equally clear about the limits of its ruling. The Court affirmed that "Plaintiffs are of course entitled to pursue valid claims for copyright infringement, and the magnitude of the alleged infringement is not a defense." *Id.* at 2. The Court identified "two principal options" that would permit Plaintiffs to pursue their claims as to the additional recordings without delaying *Suno I*. *Id.* at 3. The first was to deny the amendment and have Plaintiffs file a separate lawsuit, which the Court anticipated would be assigned to this session as a related case. *Id.* Discovery in that case, the Court observed, "could proceed on a different schedule, or indeed be stayed pending resolution of the fair use issue," and the case "could also be potentially consolidated, in whole or in part," with *Suno I*. *Id.* The second option was to "permit the amendment, but to sever and stay the claims" on the additional works "while the original lawsuit proceeds to a resolution or to some other suitable point," an approach the Court noted would track Plaintiffs' own proposal to bifurcate. *Id.* The Court found that "neither scenario is obviously preferable." *Id.* What it did conclude was that, under either, "it would be desirable to delay or defer discovery and motion practice as to the 61,026

works so as not to interfere unduly with the resolution of this matter as to the 560 original works," and that "[h]ow best to coordinate that proceeding (assuming one is filed) with this one is a question for another day." *Id.* at 3–4. The only question before the Court in resolving the Amendment Order was whether the additional works could be added to the existing claim in *Suno I*. Neither party asked the Court to decide, and the Amendment Order did not address, whether or when discovery into Suno's successor models, licensing activity, or other conduct postdating the *Suno I* record should proceed.

**D. This Action**

Plaintiffs filed this action on September 18, 2026, as the Court contemplated, and designated it as related to *Suno I*. Compl. ¶ 6; Dkt. 1-4. Suno characterizes the complaint as asserting "identical causes of action based on the same basic factual allegations." Dkt. 31 ("Motion to Stay" or "Mot.") at 4. But that description elides what is new, aside from the additional asserted works. Since Plaintiffs filed the *Suno I* complaint, Suno has released v4, v4.5, v4.5+, v5, v5.5, as well as a suite of models under the v6 umbrella. Compl. ¶¶ 42–50. The complaint alleges that Suno trained v6 on user-interaction data, uploaded recordings, and synthetic outputs generated by its earlier, infringing models, that Suno employed knowledge distillation and related model-transfer techniques to carry the learned behavior of those infringing models forward, and that it continues to retain and use the unauthorized copies of Plaintiffs' recordings it obtained in the first instance. *Id.* ¶¶ 47–49. The complaint further alleges that Suno has reversed its earlier policy against artist-name prompting, *id.* ¶ 8, that it has introduced features such as "Custom Models," which train a personalized model on recordings a user uploads, *id.* ¶ 46, that it has grown to a valuation of approximately $5.4 billion based on annual revenue in the hundreds of millions of dollars, *id.* ¶ 9, and that it has been actively negotiating training licenses with certain rightsholders while continuing to exploit and benefit from the use of Plaintiffs' works without authorization, *id.* ¶ 10. None of these facts were before the Court when Plaintiffs filed *Suno I*, and much of it post-dates the close of fact discovery on the infringement claims in *Suno I*. Moreover, the facts relating to v6

were not even known to Plaintiffs until after the Court's Amendment Order, suggesting that Plaintiffs file a new action to pursue their claims as to the additional works.

Suno answered the Complaint on October 20, 2026, asserting the same affirmative defenses it asserts in the prior action. *See* Dkt. 11; *see also Suno I*, Dkts. 28, 281.

### E. The Parties' Meet and Confer

Before Suno filed its motion, Plaintiffs told Suno that they did not consent to a stay but were "willing to discuss reasonable ways to coordinate the two actions so that work is not duplicated where the issues overlap." Dkt. 32-1 at 2. Suno did not propose any such coordination, or any intermediate path aside from a complete stay.

## III. LEGAL STANDARD

A district court's power to stay proceedings "is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis*, 299 U.S. at 254. That power is discretionary but bounded. Courts must consider: "(1) potential prejudice to the non-moving party; (2) hardship and inequity to the moving party without a stay; and, (3) judicial economy." *Energetiq Tech., Inc. v. ASML Netherlands B.V.*, 2016 WL 11727302, at *1 (D. Mass. Apr. 1, 2016) (citation omitted) (denying stay pending related IPR proceeding where movant failed to carry its burden on each factor). "[T]he suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." *Landis*, 299 U.S. at 255. In this Circuit, "stays cannot be cavalierly dispensed: there must be good cause for their issuance; they must be reasonable in duration; and the court must ensure that competing equities are weighed and balanced." *Marquis*, 965 F.2d at 1155. A movant "must carry a heavy burden" and must demonstrate "a clear case of hardship" to obtain a discretionary stay. *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 77 (1st Cir. 2004) (quoting *Austin v. Unarco Indus., Inc.*, 705 F.2d 1, 5 (1st Cir.1983)).

## IV. ARGUMENT

### A. Plaintiffs' Proposal

Plaintiffs propose a partial stay that defers substantial discovery in this action while allowing a defined and limited set of discovery to proceed in parallel with *Suno I*. The proposal has three components.

*First*, discovery to confirm Plaintiffs' ownership and chain of title for the more than 60,000 recordings asserted here would be deferred pending the Court's summary judgment ruling on fair use in *Suno I*. This is the substantial discovery that concerned the Court in the Amendment Order, and Plaintiffs agree it should await a ruling that could obviate the need to engage in this exercise. Amendment Order at 2–3.

*Second*, discovery would proceed on four defined subjects, each concerning Suno's conduct after the point at which the *Suno I* record ends: (1) Suno's successor models and its ongoing model training, development, and use of its AI models, including the training data, methodology, and provenance of the models Suno released in 2025 and 2026, including v6, Compl. ¶¶ 43–50; (2) Suno's ongoing licensing activities and efforts to license training data; (3) Suno's commercial footprint and business development, meaning its entry into new business segments, markets, and distribution channels, as well as new product features and subsequent funding rounds and the presentations made to investors in connection with them, *id.* ¶¶ 8–9, 45–46; and (4) Suno's financial condition for the period after the *Suno I* record closes. Each subject is directed to Suno's own records concerning discrete, non-duplicative recent events, and each can proceed without disrupting *Suno I*.

*Third*, all documents produced, written discovery responses served, and deposition testimony taken in *Suno I*, whether before or after entry of the order, would be deemed produced, served, and taken in this action by the same party, subject to the protective order entered in *Suno I* or an equivalent order entered here. This would bring the *Suno I* record into this case so that no witness is deposed twice on the same subject and no document is produced twice. It also answers the only burden Suno identifies in its motion, that is, the prospect of "expensive, duplicative

litigation of the same issues currently presented in" *Suno I*, Mot. at 6. With the *Suno I* record deemed produced here, the discovery that remains is confined to what Suno has not yet produced in either case. Furthermore, the benefit would be distributed equally amongst the parties, as Suno obtains the benefit of Plaintiffs' *Suno I* productions on ownership, licensing, and financial matters on the same footing as Plaintiffs obtain the benefit of Suno's productions.

The discovery that proceeds would be reciprocal. During the partial stay, Plaintiffs would provide discovery on the same or similar subjects to the extent those subjects concern them, namely the market for licensing training data for AI models, including Plaintiffs' own licensing of recordings to AI developers, and the effect of AI-generated music on the market for and value of their copyrighted works. Consistent with Plaintiffs' prior position in *Suno I*, this discovery would include proportional work-specific revenue and consumption data for the expanded list of asserted works. *See Suno I*, Dkt. 242 at 9–10 & n.6 (expressing Plaintiffs' "willing[ness] to meet and confer with Suno about what is relevant and proportional for these purposes"). Those subjects correspond to the licensing and market-impact evidence that Suno has itself sought in *Suno I* and that bears on the fourth fair use factor.

Plaintiffs recognize that any order permitting some discovery while staying the rest invites the question of how disputes about its boundaries will be managed. At this juncture, Plaintiffs are also proposing a narrowly tailored path, not a definitive statement of the discovery this case will ultimately require. Should discovery on the four subjects reveal that further discovery is necessary, or should the parties disagree about whether a particular request falls within the permitted scope, the parties may raise the matter with the Court. The Court retains full control over the sequence and scope of discovery in this action and may adjust either as *Suno I* develops. *See Landis*, 299 U.S. at 254 (power to stay is incident to the court's control over "the disposition of the causes on its docket"); *see also Marquis*, 965 F.2d at 1155 (nothing that stays must be "reasonable in duration" and the court "must ensure that competing equities are weighed and balanced"). What Plaintiffs seek is a workable starting point, rather than a freeze that forecloses progress altogether.

### B. The Stay Factors Favor Plaintiffs' Proposal

As noted above, courts in this District weigh three considerations in deciding whether to stay an action: (1) the prejudice a stay would cause the non-moving party, (2) the hardship the moving party would suffer without one, and (3) judicial economy. *Energetiq*, 2016 WL 11727302, at *1 (denying stay); *accord* Mot. at 5. Each of these considerations weighs in favor of the partial stay Plaintiffs propose.

#### *1. A Complete Stay Would Prejudice Plaintiffs*

A stay may issue only where the movant shows "a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." *Landis*, 299 U.S. at 255. The damage here is not speculative. Suno is, today, training, selling, and licensing a model for which training has not been the subject of discovery in either case. v6 was released on September 9, 2026, after Suno's corporate depositions in *Suno I* were confined to models through v5.5 and to limited aspects of v6, and its interrogatory responses were limited to models through v5, and more than eighteen months after the February 2025 cutoff of its document production. *See supra* § II.B. The only v6 testimony Suno has offered in *Suno I* concerns changes attributable to the Warner agreement, but nothing in that record addresses the data on which v6 was trained, whether that data included the outputs of Suno's earlier models, or whether Suno distilled knowledge from those infringing models into v6, as the complaint alleges. Compl. ¶¶ 47–49.

A complete stay of the duration Suno proposes, through summary judgment in *Suno I* and realistically into 2028, means that the engineers who built v6 will be asked about it, if at all, years after the fact, that the training pipelines and checkpoints they used will have been superseded by whatever Suno releases next, and that the contemporaneous record of Suno's most recent conduct will have to be reconstructed. The pace of Suno's activity underscores the risk. Given Suno's rapid, ongoing model development, each version of which displaced the last, a delay in discovery risks making it more difficult to understand how the relevant technology functioned during prior periods and may increase judicial burden by compounding the discovery that will be required to

appropriately examine all relevant technological functionalities. This concern is already manifesting, as Plaintiffs recently learned that the engineer responsible for Suno's data scraping and training data acquisition has left the company. Ex. C (I. Dukanovic Oct. 23, 2026 email).

The First Circuit has declined to impose a stay where the non-movant would be made to wait "for an undefined but potentially lengthy period" while "crucial witnesses" were lost. *Austin*, 705 F.2d at 5. And courts in this District recognize that "a prolonged stay can make discovery unnecessarily difficult . . . as relevant employees leave and memories fade." *Katz v. Liberty Power Corp., LLC*, 2020 WL 3440886, at *4 (D. Mass. June 23, 2020) (citation omitted). Suno's assurance that it is "retaining relevant data in accordance with its legal preservation obligations," Mot. at 6, addresses documents, not the institutional knowledge that only testimony captures, and its suggestion that the *Suno I* "record itself will preserve testimony from past years," *id.*, concedes the point: the *Suno I* record preserves testimony about past models, not the one Suno is selling and offering now. Suno previously recognized the cost of delay in opposing Plaintiffs' amendment to assert additional works in *Suno I.* In opposing that motion, Suno observed that deferring resolution of its fair use defense "by an unspecified amount of time" would prejudice it. *Suno I*, Dkt. 237 at 14. An even longer delay here is no less prejudicial to Plaintiffs.

That prejudice is not abstract. Suno's fair use defense turns in significant part on "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4), an inquiry that looks beyond "the particular actions of the alleged infringer" to "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market," *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (internal quotation marks omitted). Suno's conduct did not stop in February 2025, upon its document collection cutoff in *Suno I*. Since then, it has released five further model generations (v4.5, v4.5+ v5, v5.5, and v6), executed training licenses with other rightsholders, and entered new distribution channels for its outputs. Compl. ¶¶ 43–47. In the two years since *Suno I* was filed, Suno has grown from a start-up into a company valued at approximately $5.4 billion with annual

revenue in the hundreds of millions of dollars, Compl. ¶ 9, and every month of stay is another month in which Suno entrenches a market position built on the recordings at issue in this case.

Each of the four subjects on which Plaintiffs seek discovery concerns this continuing conduct that is not fully addressed in *Suno I*. Whatever use the Court ultimately makes of that evidence, Plaintiffs are entitled to gather it while it exists, and this action is the only forum in which they can do so. The prejudice is sharpened by the parties' relationship. Suno's outputs compete with Plaintiffs' recordings for listeners and streaming revenue, Compl. ¶¶ 4, 7–8, and courts in this District, including authorities on which Suno relies, have recognized that "[w]here the litigants are direct competitors, courts are hesitant to grant a stay," because the "risk of prejudice is greater . . . when the parties are competing for market share." *Aplix IP Holdings Corp. v. Sony Computer Ent., Inc.*, 137 F. Supp. 3d 3, 6 (D. Mass. 2015) (cleaned up).

Suno's response is that *Suno I* will resolve or narrow key questions, so that discovery here can wait. Mot. at 4–5. But Suno cannot both maintain in *Suno I* that its 2025 and 2026 models and commercial conduct lie outside that case, *see supra* § II.B, and argue here that *Suno I* will dispose of claims about them. Under Suno's own positions, a complete stay means that conduct is examined nowhere until at least 2028, thereby artificially truncating the fair use record. Suno's position on the asserted works is likewise inconsistent. In opposing amendment in *Suno I*, Suno argued that it would be "legal error" to assess fair use (and Plaintiffs' market dilution theory in particular) without evidence specific to the tens of thousands of works Plaintiffs sought to add. *Suno I*, Dkt. 237 at 18–19. Plaintiffs disagree with much of that, but Suno cannot now ask this Court to stay this action on the basis that a fair use ruling in *Suno I* may dispose of the dilution theory as to those same works, Mot. at 7, after telling the same Court that fair use could not properly be adjudged in *Suno I* without the discovery it demanded as to those works. In any event, Suno's suggestion that the Court may reject the market dilution theory in *Suno I* does not change the analysis. The possibility that a court will reject one of a plaintiff's theories at summary judgment is not hardship to the defendant, it is a description of every lawsuit. And the relevant and non-duplicative discovery Plaintiffs propose here does not depend on that theory. Suno's licensing

activity bears on whether a market exists for the use Suno made without paying for it, its training on outputs from prior infringing models bears on harm to the market for licensing Plaintiffs' recordings for training, its commercial expansion bears on the purpose and character of the use and ongoing market impact, and the provenance of v6 bears on whether the use Suno is making today is the use the Court will adjudicate at all.[2]

2. *Suno Identifies No Hardship*

The burden of showing hardship is "heavy" and lies with Suno. *Microfinancial*, 385 F.3d at 77. Suno has not carried its burden. The only hardship Suno identifies is the prospect of "expensive, duplicative litigation of the same issues currently presented in" *Suno I* and of discovery that may prove "unnecessary" depending on how *Suno I* is decided. Mot. at 5–8. Neither is a hardship in the relevant sense. The expense of litigating a case one would rather not litigate is the ordinary condition of every defendant, and courts in this District have held that "[l]itigation expenses, even a 'substantial and unrecoupable cost,' do not constitute irreparable injury" that warrant a stay. *Katz*, 2020 WL 3440886, at *4 (citation omitted). Nor is uncertainty about how the

[2] The Statement of Interest from the United States that Suno cites is inapplicable to Suno. *See* Mot. at 7. The government filed that statement in a case about large language models trained on newspaper text, and it rests expressly on the government's interest in "America's global AI dominance" and the national-security value of models that can "analyz[e] intelligence information" and "enhanc[e] weapon systems." Statement of Interest at 1–2, *In re OpenAI, Inc. Copyright Infringement Litig.*, No. 25-md-3143, Dkt. 316 (S.D.N.Y. Sept. 1, 2026). Those considerations have no application to a self-described "creative entertainment platform." Suno, About, https://suno.com/about (last visited Nov. 13, 2026). The Third Circuit recently addressed this Statement in a case involving AI training, observing that the government's position rested on the premise that the training at issue there "did not result in 'substitutive competition,'" a premise that failed where the defendant "trained its AI for the purpose of creating a commercial substitute" for the plaintiff's product. *Thomson Reuters Enter. Ctr. GmbH v. ROSS Intelligence Inc.*, 193 F.4th 271, 284 n.7 (3d Cir. 2026). The discovery Plaintiffs seek is designed to establish whether Suno's models are built and sold as substitutes for Plaintiffs' recordings.

Nor does the Executive Branch speak with one voice on market dilution. In the only federal criminal prosecution involving AI-generated music at scale, the Department of Justice explained that streaming royalties are paid from a fixed pool "allocated proportionally among Artists based on their respective percentages of total streams," so that the defendant's AI-generated tracks "divert[ed] sound recording royalties away from Artists whose sound recordings were legitimately streamed." Gov't Sentencing Submission at 2, *United States v. Smith*, No. 1:24-cr-00504 (JGK), Dkt. 61 (S.D.N.Y. Oct. 2, 2026). The government further explained that the defendant "turned to AI" to obtain "hundreds of thousands" of tracks precisely because spreading artificial streams across a "massive volume of songs" was what allowed the scheme "to evade detection." *Id.* at 4 & n.3. Though Smith involved fraudulent streams, the royalty-pool structure the government described does not depend on how the streams are generated. Every stream of an AI-generated track reduces the pro rata share paid to every human artist in the same period, and the capacity to generate tracks at volume is what makes such dilution possible at scale. *See* Compl. ¶ 4.

Court will rule on a defense a reason to suspend discovery pending the ruling. If it were, every case in which a dispositive motion was anticipated would be stayed until it was decided.[3]

In any event, Plaintiffs' proposal eliminates the duplication Suno describes. The work-specific discovery on over 60,000 recordings that Suno says would be "necessary" if fair use is rejected, Mot. at 5, would be deferred until the Court rules. The *Suno I* record would be deemed produced in this action, such that no *Suno I* witness is re-deposed on *Suno I* subjects and no *Suno I* document is re-produced. What remains is discovery on four defined subjects concerning Suno's own conduct that post-dates the *Suno I* record, directed to materials Suno has not produced. That is not duplicative.

*3. Judicial Economy Favors Coordination*

Suno's principal argument is that the Court "already contemplated" a stay when it denied Plaintiffs' motion to amend. Mot. at 5; *see also id* at 8. The Amendment Order did not endorse that approach. The Court listed a stay as one of several options, alongside proceeding "on a different schedule" and consolidation "in whole or in part," noting that "neither scenario is obviously preferable." Amendment Order at 3. The Court defined the objective as ensuring that discovery on the additional works not "interfere unduly with the resolution of this matter as to the 560 original works," and reserved "[h]ow best to coordinate" the two cases as a question "for another day." *Id.* at 3–4. That objective must be understood with the context of the question the Court was deciding in the Amendment Order, namely, whether 61,026 works could be added to the existing claim. The Order did not consider whether or when discovery into Suno's successor models, licensing activity, and other conduct postdating the *Suno I* record should proceed. Plaintiffs' proposal achieves the Court's stated objective, while respecting the limits of its ruling.

[3] Suno faces several additional copyright actions arising from the same training conduct, several of which were filed within the past few months. *See, e.g.*, *Elvis Presley Enterprises, LLC v. Suno, Inc.*, No. 3:26-cv-13398 (N.D. Cal. filed Nov. 6, 2026); *Eight Mile Style LLC v. Suno, Inc.*, No. 3:26-cv-13399 (N.D. Cal. filed Nov. 6, 2026); *Reservoir Media Management, Inc. v. Suno, Inc.*, No. 3:26-cv-12305 (N.D. Cal. filed Oct. 21, 2026); *Gerencia 360 Music, Inc. v. Suno, Inc.*, No. 3:26-cv-09248-CRB (N.D. Cal. filed Aug. 31, 2026); *Round Hill Music LP v. Suno, Inc.*, No. 3:26-cv-08507-RFL (N.D. Cal. filed Aug. 17, 2026); *see also Justice v. Suno*, No. 1:25-cv-11739 (FDS) (D. Mass. filed. June 14, 2025). That Suno will likely have to engage in discovery in at least some of these cases is yet another reason why Suno cannot claim hardship from the targeted discovery contemplated here.

The discovery that could have interfered with *Suno I*—the work-specific discovery on 60,000 recordings—is deferred, while the discovery that proceeds concerns matters the Amendment Order did not address and *Suno I* does not reach, without interrupting discovery in the prior suit. Suno's reading, by contrast, would have the Court direct Plaintiffs to file a second action for the purpose of suspending it entirely on arrival. That is not a natural reading of an order that affirmed Plaintiffs' entitlement "to pursue valid claims for copyright infringement" and chose "proceeding in parallel cases" as the course that "best balances any prejudice to Suno from further delay, plaintiffs' right to pursue their copyright claims, and the interests of judicial economy." *Id.* at 2–3.

Nor does a complete stay serve judicial economy on its own terms. Both parties expect the Court's fair use ruling in *Suno I* may inform the issues here. Plaintiffs' proposal captures the full benefit of those forthcoming rulings by deferring the discovery a fair use ruling may obviate and carrying over the *Suno I* record so nothing is done twice. Suno's proposal only adds delay. A complete stay would not spare the Court any ruling it must otherwise make or any discovery it must otherwise supervise. It would simply push all of it past a ruling in *Suno I* and run the two cases consecutively rather than concurrently. The discovery Plaintiffs propose will be needed in this action whether it is taken in 2027 or in 2028. Under Suno's approach, it would not begin until 2028, with work-specific discovery on 60,000 recordings, expert discovery, and dispositive motions to follow, so that an action filed in 2026 would reach summary judgment years later than it otherwise could, on a record that will by then be harder to assemble. That is why the First Circuit requires that stays be "reasonable in duration," *Marquis*, 965 F.2d at 1155.

Courts in this District have likewise recognized that a stay is "not the only mechanism available to streamline" a case that overlaps with another, *A.L.M. Holding Co. v. All States Materials Grp., Inc.*, 784 F. Supp. 3d 417, 422 (D. Mass. 2025), and that stays "can and should be tailored to avoid undue prejudice" rather than imposed across the board, *Green v. Cosby*, 177 F. Supp. 3d 673, 678 (D. Mass. 2016). Plaintiffs' proposal asks nothing of the Court beyond a cross-use order and a discovery schedule tailored to what *Suno I* does not encompass. By contrast, Suno's proposal asks the Court to do nothing for two years and then take up, from a colder record, the

same work that could be sequenced now. The former is efficiency, while the latter is the postponement Suno itself called prejudicial in opposing Plaintiffs' original amendment in *Suno I*.

### C. Plaintiffs' Alternative Relief

Should the Court be inclined to enter a broader stay, Plaintiffs alternatively request that the Court (1) enter the cross-use order described above now, so that the benefit of the *Suno I* record is secured irrespective of the stay's scope; (2) enter a preservation order addressed specifically to training datasets, model checkpoints, user-interaction and preference data, and related engineering documentation for every model Suno has released or is developing, including v5, v5.5, and v6; and (3) provide that the stay will lift automatically upon the Court's decision on summary judgment in *Suno I*, rather than upon the exhaustion of any appeal, with a joint status report due within fourteen days thereafter.

## V. CONCLUSION

More than two years ago, Plaintiffs sued Suno on the works they could identify after Suno declined to reveal the contents of its training data. They have spent much of the intervening time uncovering the full scope of Suno's infringement. Having forced the resulting claims into a second case, and having insisted in *Suno I* that delay was a prejudice it should not bear, Suno should not be permitted to insist that the second case wait for the first, or that the conduct it has kept out of the first may be examined in neither. Plaintiffs do not ask for unrestricted discovery. They ask for a narrowly tailored path on four defined subjects, reciprocal as to both sides, with the *Suno I* record carried over so that nothing is done twice, and with any need for more left to the Court's judgment. The Court should deny the motion to the extent it seeks a complete stay and enter the partial stay as Plaintiffs propose.

Dated: November 13, 2026

By: ______________________________

Moez M. Kaba*
Mariah N. Rivera*
Alexander R. Perry*
**HUESTON HENNIGAN LLP**
1 Little West 12th Street
New York, New York 10014
Telephone: (646) 930-4046
Facsimile: (888) 775-0898
mkaba@hueston.com
mrivera@hueston.com
aperry@hueston.com

Christina V. Rayburn*
**HUESTON HENNIGAN LLP**
620 Newport Center Dr., Suite 1300
Newport Beach, California 92660
Telephone: (949) 356-6412
Facsimile: (888) 775-0898
crayburn@hueston.com

Rajan S. Trehan*
**HUESTON HENNIGAN LLP**
523 West 6th Street, Suite 400
Los Angeles, California 90014
Telephone: (213) 788-4340
Facsimile: (888) 775-0898
rtrehan@hueston.com

Daniel J. Cloherty
Alexandra Arnold
**CLOHERTY & STEINBERG LLP**
One Financial Center, Suite 1120
Boston, Massachusetts 02110
Telephone: (617) 481-0160
Facsimile: (617) 848-0830
dcloherty@clohertysteinberg.com
aarnold@clohertysteinberg.com

**Admitted pro hac vice*

*Counsel for Plaintiffs UMG Recordings, Inc., Capitol Records, LLC, Sony Music Entertainment, Alamo Records, LLC, Arista Music, Arista Records, LLC, LaFace Records, LLC, Records Label, LLC, Sony Music Entertainment US Latin, LLC, Ultra Records, LLC, Volcano Entertainment III, LLC, and Zomba Recording LLC*