# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, SONY MUSIC ENTERTAINMENT, ALAMO RECORDS, LLC, ARISTA MUSIC, ARISTA RECORDS, LLC, LAFACE RECORDS, LLC, RECORDS LABEL, LLC, SONY MUSIC ENTERTAINMENT US LATIN, LLC, ULTRA RECORDS, LLC, VOLCANO ENTERTAINMENT III, LLC, and ZOMBA RECORDING LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SUNO, INC. and JOHN DOES 1-10,<br><br>Defendants. | Civil Action No. 1:26-cv-14275-FDS |

**DECLARATION OF BRITTANY N. LOVEJOY IN SUPPORT OF DEFENDANT SUNO, INC.'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY**

I, Brittany N. Lovejoy, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am a partner at Latham & Watkins LLP and counsel of record for Suno, Inc. in the above-captioned action. I am admitted to practice in the State of California, and I have been admitted *pro hac vice* in this matter. I submit this declaration in support of Suno's Reply Memorandum of Law in Support of its Motion to Stay the above-captioned action.

2. Attached as **Exhibit A** is a true and correct copy of excerpts from the Deposition Transcript of Tara Bruh, dated September 16, 2026.

3. Attached as **Exhibit B** is a true and correct copy of excerpts from the Deposition Transcript of Kim Beauchamp, dated September 30, 2026.

4. Attached as **Exhibit C** is a true and correct copy of excerpts from the Deposition Transcript of Jack Brody, dated September 29, 2026.

5. Attached as **Exhibit D** is a true and correct copy of excerpts from the Deposition Transcript of Jeremy Paul Sirota, dated August 10, 2026.

6. Attached as **Exhibit E** is a document reflecting the Rule 30(b)(6) topics on which Suno's CEO, Mikey Shulman, has been designated as Suno's corporate representative.

7. Attached as **Exhibit F** is a true and correct copy of an excerpt from the Deposition Transcript of Antonio Rodriguez, dated September 3, 2026.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 20, 2026 in Lafayette, CA.



Brittany N. Lovejoy

**CERTIFICATE OF SERVICE**

I hereby certify that true, unredacted versions of the foregoing document and all accompanying exhibits were served by electronic mail on all counsel of record this 20th day of November, 2026.

*/s/ Brittany N. Lovejoy*
Brittany N. Lovejoy

# Exhibit A

# FILED UNDER SEAL

# Exhibit B

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---oOo---

UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, SONY MUSIC ENTERTAINMENT,

Plaintiffs,

vs. CASE NO. 1:24-CV-11611-FDS

SUNO, INC.,

Defendant.

---

*** HIGHLY CONFIDENTIAL ***

VIDEO-RECORDED DEPOSITION OF KIM BEAUCHAMP

VIA VIDEO CONFERENCE

Wednesday, September 30, 2026

Stenographically Reported by: Ashley Soevyn,
California CSR No. 12019
Job No. SF 8346252

Q Have you seen these documents before?
A Yes, this looks familiar.
Q Can you recall when you saw these documents before if you've seen them?
A I think Alex showed me this one yesterday. I'm pretty sure I saw it before that, but I can't remember a specific date.
Q Looking at Exhibit 4 titled "Sound Recordings at Issue", I'd like to direct your attention to rows one through 385. And then rows 436 through 555. Let me know when you've reviewed.
A I'm sorry. Say the row numbers again?
Q Sure. So one through 385 and then 436 through 555, please.
A Okay. Yeah.
Q You understand that those are the works that UMG and Capitol Records have asserted in the complaint, correct?
A Yeah.
Q And you're prepared to testify as to the deposit copies submitted as to those works, correct?
A I believe so. I mean, you know, there is a lot of recordings here. So I have this aid where we've broken down the actual tracks that I've reviewed. I can't say without going line by line in

this document that it matches this. But if, you know, if they match what is on this sheet, then yes. If it doesn't, then no.

Q Okay.

A I'm sorry. There is just a lot to just, you know, I don't want to misstate here.

Q Looking at the fourth column titled "Registration Number" that lists the copyright registrations UMG has asserted are associated with the works in this lawsuit, right?

A That's what it appears to represent.

Q And you were not personally involved with the registration applications for any of those works, right?

A That is correct.

Q Do you know who was responsible for those registrations?

A I do not.

Q Okay. If you can take a look at Exhibit 4 at row 469, do you see the work, "Voulez-Vous" by Abba?

That's row 469, please.

A Yes, I see it.

Q And the registration number listed for that sound recording is SR0000010318, right?

# Exhibit C

Array

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, and SONY MUSIC ENTERTAINMENT,

Plaintiffs,

vs.

SUNO, INC., and JOHN DOES 1-10,

Defendant.

Case No. 1:24-cv-11611(FDS)

CERTIFIED COPY

CONFIDENTIAL

ATTORNEYS' EYES ONLY

[HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL ONLY]

Video Deposition of JACK BRODY taken on behalf of Plaintiffs at 523 W. 6th Street, Suite 400, Los Angeles, California commencing at 9:17 a.m. on Tuesday, September 29, 2026, before Rebecca A. Harp, Certified Shorthand Reporter No. 11895.

answered.

THE WITNESS: I think there are very few things when you are joining a startup where you can eliminate all doubt.

BY MR. TREHAN:

**Q Let's talk about your current knowledge today. You have now been serving as the chief product officer at Suno for about two years.**

[redacted]

BY MR. TREHAN:

**Q How did you gain that understanding?**

A Chatting with people on the team.

**Q** [redacted]

[redacted]

**Q You responded the following day with a revised graphic, and you say -- you tweet -- the text of your tweet was fixed it, correct?**

A Yes.

**Q And the revised graphic reflected a dot in the far right corner for Suno V5, right?**

MS. DUKANOVIC: Objection. Misstates the document.

THE WITNESS: I do think that is right, yes.

BY MR. TREHAN:

**Q How did you prepare that graphic?**

A I am not sure.

**Q Do you know whether or not you prepared it?**

A Yes. I may have used Figma or something. Screenshoted the original chart and then used that Figma design tool to add the Suno V5. up top.

**Q Did that reflect testing you had actually done on Suno V5?**

MS. DUKANOVIC: Objection. Scope.

THE WITNESS: I believe this was more of a kind of satirical directionally correct response here just indicating that V5 had come a really long way since V3.5.

BY MR. TREHAN:

**Q Had come a really long way in what respect?**

MS. DUKANOVIC: Objection. Scope.
THE WITNESS: It's perceived quality which was, as I understand it, one of the dimensions in which these Elo ratings operate.
BY MR. TREHAN:
**Q And those Elo ratings are based on actual human responses, correct?**
MS. DUKANOVIC: Objection. Scope. Foundation.
THE WITNESS: I think that is part of it. I am not positive.
BY MR. TREHAN:
**Q Was your Suno V5. based on any actual human responses?**
MS. DUKANOVIC: Objection. Scope.
THE WITNESS: Not that I am aware of, but it is possible.
BY MR. TREHAN:
**Q Regardless, you believed that Suno V5 reflected an advancement by several magnitudes over any other model that your competitors had released. Is that right?**
MS. DUKANOVIC: Objection. Scope.
THE WITNESS: Do you mean by like orders of magnitude? I think this suggested some linear fashion.

But, yes, I believe it was a better model than the previous models that were shown here.

BY MR. TREHAN:

**Q Did you have any basis for that belief at this time?**

MS. DUKANOVIC: Objection. Form.

THE WITNESS: I don't recall exactly what the basis for that was. I am sure there was some basis.

BY MR. TREHAN:

**Q Do you know what any of your competitors' models were trained on?**

MS. DUKANOVIC: Objection. Form. Lacks foundation.

THE WITNESS: I don't know the specifics of what competitors trained their models on.

MS. DUKANOVIC: Also, this is outside the scope.

BY MR. TREHAN:

**Q Let me ask a different question.**

**Do you know whether or not any of the competitors that you identified that operate in the generative music space have utilized unlicensed copyrighted recordings?**

MS. DUKANOVIC: Objection. Scope. Calls for legal conclusion.

THE WITNESS: I don't know how other models were trained.
BY MR. TREHAN:
**Q But you believe that those companies are competitors of Suno regardless of whether or not they used unlicensed copyrighted recordings?**
MS. DUKANOVIC: Objection. Vague. Calls for legal conclusion.
THE WITNESS: I believe if a company offers a generative AI music creation service to consumers, they are competing with us.
BY MR. TREHAN:
**Q Okay. Do you believe that the quality of Suno training data has permitted it to create a better model than its competitors?**
MS. DUKANOVIC: Objection. Scope.
THE WITNESS: I don't know specifically what role that may or may not have played in the quality of our models.
BY MR. TREHAN:
**Q When you are considering who your current competitors are or the features, services, and training impact vis-à-vis your considered competition, what are you looking at?**
A I'm sorry, can you restate the question?

**Q Sure. So the prior question was, do you think that the quality of Suno's training data has permitted it to create a better model than its competitors. And I am asking simply in respect to Topic 25, which concerns how Suno's features, services, and training impact its position vis-à-vis its considered position.**

A I see.

**Q What role training data plays in that?**

A [redacted]

**Q** [redacted]

[redacted]

MS. DUKANOVIC: Objection. Form.

[redacted]

[redacted]

[redacted]

**Q Okay. One of the features that we discussed earlier was off-line mode. Do you recall that?**

A I do.

MR. TREHAN: So this is Exhibit 11.

(Exhibit 11 marked.)

that.

BY MR. TREHAN:

**Q Okay. Did Suno attempt to carry out any formal market research as to whether or not that would be a feature that users wanted?**

A I think there were probably various forms of informal research conducted on that front. I don't know if there was -- I don't believe there was a formal study specifically targeting that request.

**Q Do you know if there was a survey conducted?**

A I don't believe so.

**Q You already referenced this, but since January 2026, Suno replaced a reference to an artist name with a map of various style tags that correlate to that artist, correct?**

A That's right.

**Q For example, a reference to Taylor Swift might map to pop, singer-songwriter, something of that nature?**

A Yes.

**Q How did Suno determine what specifically replaces the artist's name?**

A I believe that there is a general mapping of descriptions to artists that is widely available, that the system can better kind of understand how people are

[redacted]

MR. TREHAN: Okay. Let's go ahead and take a break and go off the record.

VIDEOGRAPHER: We are going off the record. The time is 4:53.

(Off the record.)

VIDEOGRAPHER: We are back on the record. The time is 5:11.

BY MR. TREHAN:

**Q We are now going to move to Topic 70 and 75.**

**You're Suno's designee on these topics which concern in general the actual or currently contemplated market for which Suno has or intends to advertise, market, or otherwise publicize its AI service.**

**Then it specifies several specific markets that would be encompassed by this topic including streaming, sync, commercial licensing for sound**

**recordings, the market for training data, the market for terrestrial and digital radio and the market for derivatives.**

**Do you see that?**

A I do.

**Q What markets does Suno currently advertise market or otherwise publicize its AI service?**

A In the market of generative music creation.

**Q What about with respect to these specific markets, does it advertise market or otherwise publicize its service with respect to any of the listed markets?**

A No.

**Q What did you do to determine whether or not Suno was advertising, marketing, or otherwise publicizing its AI service with respect to any of those listed markets?**

A I met with counsel, reviewed some documents, and I am exposed to the way in which we advertise, market, or publicize our AI service over the general course of my job.

**Q Earlier in discussing a separate issue, you referenced a very large amount of content that is created by Suno's marketing team.**

**Do you recall that?**

A I do.

**Q Did you review any of that content?**

MS. DUKANOVIC: Objection. Form.

THE WITNESS: I come across a lot of that content in the daily course of my role.

BY MR. TREHAN:

**Q Did you review any of that content in preparation for your testimony on these topics?**

A I don't believe so.

[redacted]

[redacted]

**Q How much did Suno spend on marketing?**

MS. DUKANOVIC: Objection. Scope.

You can answer if you know in your personal capacity.

THE WITNESS: I don't know the specific number.

MR. TREHAN: I am going to hand you what has been marked as Exhibit 13.

(Exhibit 13 marked.)

BY MR. TREHAN:

**Q Exhibit 13 is Suno's amended and supplemental responses and objections to plaintiff's interrogatories, Number 21, 22, and 24.**

**Have you reviewed this ever before?**

A Can I take a minute to review it now to --

**Q I actually only need you to review a single one of the responses. There is many of these that have nothing to do with you so --**

MS. DUKANOVIC: You can take your time to review the document.

joined.

BY MS. DUKANOVIC:

**Q You also recall we spent some significant time today discussing Topics 70 and 75 with respect to your 30(b)(6) testimony.**

**Do you recall that?**

A I do.

**Q As chief product officer, can you describe what your day-to-day responsibilities include with respect to how Suno's product is marketed and publicized?**

MR. TREHAN: Is this in his 30(b)(6) capacity or personal capacity?

MS. DUKANOVIC: 30(b)(6).

THE WITNESS: As the chief product officer, I am involved in the overall product strategy and the services we provide and the market within which we operate, which is the generative music creation market.

BY MS. DUKANOVIC:

**Q Do you recall Mr. Trehan asked you a number of questions about Suno's relationship to various submarkets, streaming, sync, commercial licensing, training data, radio and derivatives?**

MR. TREHAN: Objection. Mischaracterizes questions, but...

THE WITNESS: I do.

BY MS. DUKANOVIC:

**Q Can you describe what Suno actually advertises and markets to its users?**

MR. TREHAN: Objection. Vague. Leading.

THE WITNESS: We advertise and market our product as a generative music creation tool for creating original music. That is the market within which we operate and advertise in.

BY MS. DUKANOVIC:

**Q Taking one example, Mr. Trehan asked you questions about, in Topics 70 and 75, the market for training data.**

**Does Suno advertise market or publicize its AI service as a product for the training data market?**

A I took this topic to mean does Suno sell any training data and provide services within that market to which the answer is no. We do not.

**Q And that was your understanding with respect to this specific submarket in the context of these 30(b)(6) topics?**

MR. TREJAN: Objection. Leading. Vague.

THE WITNESS: That's correct.

BY MS. DUKANOVIC:

[redacted]

[redacted]

[redacted]

[redacted]

BY MS. DUKANOVIC:

**Q And to be clear that was the -- your understanding of the scope of Topic 70 and 75?**

A Yes.

MR. TREHAN: Objection. Vague.

MS. DUKANOVIC: That is all the questions I have.

I am just going to state for the record that

# Exhibit D

# FILED UNDER SEAL

# Exhibit E

**M. Shulman Designated 30(b)(6) Topics**

**Topic No. 19:** The general conceptualization of Suno's music-generative AI service, including its founders and employees. Scope to include the persons involved in generally conceptualizing Suno's music-generative AI service (inclusive of founders, employees, and investors).

**Topic No. 53:** The document Bates-stamped SUNO_00024777.

**Topic No. 78 and 79:** In general, Suno's understanding of its current or likely impact on the market for sound recordings.

**Topics 80, 81, and 82:** Pre- and post-suit discussions of licensing sound recordings as training data for Suno's generative music AI service/tool. Scope to exclude Warner settlement agreement.

**Topic No. 88:** In general, the non-privileged scope of Suno's pre-suit understanding of copyright law, as applied to Suno.

**Topic No. 93:** Suno's pre-suit awareness, knowledge, and/or understanding of the copyright owners of the sound recordings Suno allegedly downloaded, copied, and/or reproduced in the process of developing its training data and/or AI Models, including any pre-suit investigation it performed or efforts it undertook to identify the copyright owners of specific sound recordings.

**Topic No. 94:** Suno's policies and procedures in place related to notices or complaints received about alleged copyright violations, to the extent such information is not privileged.

**Topic No. 95:** The notices or complaints Suno has received related to purported copyright violations, to the extent such information is not privileged.

**Topic No. 105:** Suno's corporate structure.

**Topic No. 110:** In general, Suno's pre-suit correspondence with Plaintiffs and/or the RIAA.

**Topic No. 112:** Suno's licensing considerations inside and outside the walled-garden framework, including the terms it considered and the reasons it did or did not consummate such arrangements. Scope to exclude Warner settlement agreement.

**Topic No. 113:** Facts in Suno's custody or control that it intends to use in support of its copyright misuse defense.

# Exhibit F

# FILED UNDER SEAL